[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-2352
Non-Argument Calendar
_____

D. C. Docket No. 5:96-CV-220-RH
Bkcy No. 93-02135

IN RE: A.W. & ASSOCIATES, INC.,

                                                    Debtor.

WILLIAM J. MILLER, JR.,

                                        Plaintiff-Appellant,

        versus

FLORIDA MINING AND MATERIALS,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____
**(March 17, 1998)**

Before COX, DUBINA and BLACK, Circuit Judges.

PER CURIAM:

This appeal raises the question of whether a bankruptcy court must consult industry standards in determining whether an allegedly preferential transfer qualifies for the exception provided by 11 U.S.C. § 547(c)(2). We conclude that industry standards must be consulted.

## I. BACKGROUND

Appellant A.W. & Associates, Inc. (A.W.) is a construction company that regularly purchased concrete and concrete-related products from Appellee Florida Mining and Materials (Florida Mining), a supplier of those products. Prior to January 1993, A.W. often failed to make timely payments, and a number of A.W.'s checks to Florida Mining had been dishonored for insufficient funds. Despite these problems, Florida Mining continued to fill orders from A.W. In January 1993, A.W. notified Florida Mining that it wished to purchase materials from Florida Mining's Tampa office. The terms for this project made payments due on the tenth of the month following the month of delivery.[1]

---

[1] Florida Mining's standard invoice provides that "[t]erms, unless otherwise agreed, are net 30 days, no discounts, no retainage." Any deviation from the standard terms is reflected on the front of the invoice. Florida Mining commonly deviates from the standard terms with its customers, depending on the nature of each project. Before deciding on terms, the customer's payment history is normally given to the credit manager. In previous projects, A.W.'s terms with Florida Mining had been "2% 10th, Net 30," meaning that there was a 2% discount if an invoice was paid by the 10th of the month following the month of delivery; otherwise, payment was due on the 30th of the month following the month of delivery.

A.W. batched together invoices for deliveries from Florida Mining's Tampa office dated January 29, February 1, February 2, February 3, and February 4, 1993, and submitted a check to Florida Mining in the amount of $6,131.05 on March 5, 1993.[2] The check initially was dishonored, but was resubmitted and paid on March 10, 1993. This check is the subject of the present dispute. Under the terms of the Tampa account, the January 29 invoice was paid late, while the other invoices were paid on time.[3] Despite the late January payment, Florida Mining apparently was not concerned about A.W.'s account and continued to make deliveries to A.W. in February and March.

On May 3, 1993, A.W. filed for bankruptcy and William J. Miller, Jr., (Trustee) was appointed as trustee. The Trustee filed a complaint in the bankruptcy court seeking to avoid the March 10 payment as a preferential transfer under 11 U.S.C. § 547(b). Florida Mining responded that the payment had been made in the ordinary course of business and therefore was exempt from the Trustee's avoidance

[2] A.W. ordinarily paid invoices in batches, whereby related invoices were grouped together and paid with a single check. Because some of the invoices in a given batch were from deliveries made during different months, the invoices had different due dates. Thus, some invoices were paid on time and some were paid late. Florida Mining accepted this practice and continued making deliveries.

[3] Because the terms of the Tampa account made payment due on the 10th of the month following the month of delivery, payment for the January 29 delivery was due on February 10 while payments for the four February deliveries were due on March 10. The March 10 payment was therefore timely for the February deliveries but late for the January 29 delivery.

powers under 11 U.S.C. § 547(c)(2).[4]  Following a trial, the bankruptcy court concluded the transfer was made in the ordinary course of business between the parties and was not the result of extraordinary collection efforts.  The bankruptcy court ruled that the § 547(c)(2) exception depends "upon the debtor's internal operations and the circumstances of the transactions in question, not industry standards."  The district court affirmed the bankruptcy court, and this appeal followed.[5]

## II.  DISCUSSION

We review the bankruptcy court's factual findings for clear error.  *In re Patterson*, 967 F.2d 505, 508 (11th Cir. 1992).  We review the bankruptcy and district courts' conclusions of law de novo.  *Id.*

---

[4] The Trustee argued that the payment was not in the ordinary course of business between A.W. and Florida Mining for three reasons: (1) payment for the January 29 delivery was late; (2) the check had been returned for insufficient funds and reissued; and (3) the payment terms of the Tampa account were different than previous payment terms between A.W. and Florida Mining.

[5] The district court declined to decide whether industry standards must be examined in evaluating the ordinary course of business exception, but stated that the disputed payment was made in the ordinary course of business even if industry standards are considered.  However, there is no evidence of industry standards in the record to support the district court's conclusion.

Under 11 U.S.C. § 547(b), a trustee may avoid preferential transfers.[6]  Section

547(c)(2) provides an exception to the trustee's avoidance power:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . .
>
>> (2) to the extent that such transfer was—
>>
>>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>>
>>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee;  and
>>>
>>> (C) made according to ordinary business terms.

---

[6] 11 U.S.C. § 547(b) provides:
> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made—
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if—
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

5

11 U.S.C. § 547(c)(2). This exception operates as an affirmative defense; a creditor asserting that a transfer falls within § 547(c)(2) bears the burden of proving each of the three elements. 11 U.S.C. § 547(g).

The parties agree that A.W.'s payment to Florida Mining for the January and February invoices was a preferential transfer pursuant to § 547(b). The parties dispute whether the payment qualifies for the § 547(c)(2) exception. The Trustee argues that the reference in subsection (c)(2)(C) to "ordinary business terms" requires the bankruptcy court to examine industry standards in evaluating a disputed transaction, thereby imposing an objective criterion into the § 547(c)(2) analysis.[7] Accordingly, the issue on appeal is whether the bankruptcy court correctly interpreted the language of § 547(c)(2)(C) in concluding that industry standards are not relevant when determining whether the Trustee could avoid the disputed transfer.

This Court has never decided whether industry standards must be considered when determining whether a payment qualifies for the exception within 11 U.S.C. § 547(c)(2). The bankruptcy court found that § 547(c)(2) does not contain a

---

[7] The Trustee also disputes the bankruptcy court's factual finding that the transfers were within the ordinary course of business between this debtor and this creditor. In light of A.W.'s history of late payments, Florida Mining's apparent lack of concern about the account, and Florida Mining's practice of changing payment terms with each account, the bankruptcy court's factual determination that the payment was in the ordinary course of business *vis-a-vis* these two parties was not clearly erroneous.

requirement that industry standards be examined, citing *Marathon Oil Co. v. Flatau* (*In re Craig Oil Co.*), 785 F.2d 1563 (11th Cir. 1986).[8]

In *Craig Oil*, this Court discussed whether a debtor's payments by cashier checks to a creditor had been made in the ordinary course of business, noting that resolution of the issue "turns on the specific events surrounding [debtor's] payments to [creditor]." *Id.* at 1565. Because the disputed payment in *Craig Oil* was extraordinary in the course of business between the creditor and the debtor, this Court did not need to determine whether a creditor must withstand an additional inquiry into the relevant industry standards to establish the affirmative defense provided by § 547(c)(2).[9]

The other circuits that have considered the issue uniformly agree that the language of subsection (c)(2)(C) requires bankruptcy courts to consult industry

---

[8] We recognize that other circuits have assumed that *Craig Oil* settled the issue in this Circuit by focusing exclusively on the course of business between the parties. *See Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 39, 41 (2d Cir. 1996); *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 n.3 (4th Cir. 1994); *Jones v. United Sav. and Loan Ass'n.* (*In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*), 9 F.3d 680, 684 (8th Cir. 1993); *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1031 (7th Cir. 1993). As explained below, the facts of *Craig Oil* did not present this Court with the opportunity to reach the question of whether industry standards must be examined for a creditor to satisfy the burden of § 547(c)(2).

[9] We acknowledge that *Craig Oil* contains dicta suggesting that the bankruptcy court may focus exclusively on the relationship between the parties. 785 F.2d at 1565, 1566. Despite this dicta, the Court noted that the debtor did not usually pay other creditors with cashier's checks, and that the creditor did not often receive them from its customers, suggesting that the Court considered industry standards in applying § 547(c)(2). 785 F.2d at 1566-67 and n.7.

standards in classifying a disputed transfer. *See Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 41 (2d Cir. 1996); *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.* (*In re Molded Acoustical Prods., Inc.*), 18 F.3d 217, 225 (3d Cir. 1994); *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 (4th Cir. 1994); *Logan v. Basic Distrib. Corp.* (*In re Fred Hawes Org., Inc.*), 957 F.2d 239, 244 (6th Cir. 1992); *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032-33 (7th Cir. 1993); *Jones v. United Sav. and Loan Ass'n.* (*In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*), 9 F.3d 680, 684 (8th Cir. 1993); *Mordy v. Chemcarb, Inc.* (*In re Food Catering & Hous., Inc.*), 971 F.2d 396, 398 (9th Cir. 1992); *Clark v. Balcor Real Estate Fin., Inc.* (*In re Meridith Hoffman Partners*), 12 F.3d 1549, 1553 (10th Cir. 1993). These cases emphasize that an interpretation of § 547(c)(2)(C) which focuses exclusively on the relationship between the creditor and the debtor would deprive subsection (c)(2)(C) of any independent meaning because subsection (c)(2)(B) already requires that the payment be evaluated in the context of the ongoing relationship between the debtor and the creditor. *See, e.g., Roblin*, 78 F.3d at 41; *Fred Hawes Org.*, 957 F.2d at 244.[10]

---

[10] The Seventh Circuit offered two rationales for consulting industry standards: (1) comparison to industry standards serves the evidentiary function of providing a basis to evaluate the parties' self-serving testimony that an extraordinary transaction which was in fact intended as a preference towards a particular creditor was instead part of a series transactions within a business relationship; and (2) reference to industry standards reassures other creditors that deals have not been worked out favoring a particular creditor, which would permit a preference to slide under the

We agree with the majority view and hold that § 547(c)(2) requires the bankruptcy court to examine industry standards.[11] The Seventh Circuit correctly envisioned of the role of industry standards. Industry standards do not serve as a litmus test by which the legitimacy of a transfer is adjudged, but function as a general backdrop against which the specific transaction at issue is evaluated.

> "[O]rdinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Tolona Pizza*, 3 F.3d at 1033; *see also Molded Acoustical Prods.*, 18 F.3d at 225-26 (range of permissible deviation from industry standards determined by extent to which the relationship between the parties is "cemented").

## III. CONCLUSION

The bankruptcy court erred in failing to consider industry standards in determining whether the disputed transfer satisfied the provisions of § 547(c)(2). Accordingly, the judgment is vacated and the case is remanded to the district court.

VACATED and REMANDED.

---

§ 547 fence. *Tolona Pizza*, 3 F.3d at 1032.

[11] We express no opinion as to whether consulting industry standards will change the outcome in this case; we hold only that the bankruptcy court erred in not considering industry standards.