[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 8, 2004
THOMAS K. KAHN
CLERK

No. 04-10021

D.C. Docket Nos. 02-00524-CV-WBH-1,
96-79738 BKC-RE

In Re:      ISSAC LEASECO, INC.,

Debtor.

BARRETT DODGE CHRYSLER
PLYMOUTH, INC.,

Plaintiff-Appellant,

versus

DAVID W. CRANSHAW, Trustee for the
Estate of ISSAC LEASECO, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

(November 8, 2004)

Before EDMONDSON, Chief Judge, PRYOR and FAY, Circuit Judges.

PRYOR, Circuit Judge:

The issue presented in this appeal is whether the bankruptcy court clearly erred in holding that three of ten sales of used cars to a debtor were not according to "ordinary business terms," under section 547(c)(2)(C) of the Bankruptcy Code, because those sales, in contrast with the other seven, took longer to close than the industry average. The resolution of this issue will determine the availability of a defense under section 547(c), which allows a creditor to keep assets transferred "in the ordinary course of business" by the debtor during the preference period of 90 days before the filing of the bankruptcy petition. Because the determination of ordinary business terms is a question of fact best left to the bankruptcy court, we conclude that the bankruptcy court did not clearly err when it found, based on expert testimony, that the sales were not according to ordinary business terms.

## I. BACKGROUND

Barrett Dodge Chrysler Plymouth and Issac LeaseCo had a six-month business relationship in which Barrett Dodge sold used cars to LeaseCo. These sales were not contemporaneous exchanges of money and documents. To complete a sale, Barrett Dodge delivered an automobile to LeaseCo in exchange

for a sight draft, which is a negotiable instrument payable upon presentment. Before Barrett Dodge could present the sight draft for payment, it had to provide LeaseCo a bill of sale and title documents, and Barrett Dodge had to ensure that all fees and taxes pertaining to the vehicles were paid by the previous owners. These transactions typically took weeks to complete.

On August 1, 1996, creditors of LeaseCo filed an involuntary bankruptcy petition. David W. Cranshaw was appointed trustee in charge of managing the dissolution of the bankruptcy estate. Cranshaw filed an adversary proceeding against Barrett Dodge and sought the return of funds paid to Barrett Dodge for ten used cars purchased during the 90 days before the filing of the petition for bankruptcy. Cranshaw sought the return of those funds under section 547(b), the "preference" statute of the Bankruptcy Code, which allows the trustee to avoid certain transfers from the debtor to a creditor during the preference period. Barrett Dodge asserted a defense that, under section 547(c), the transfers were exempt from avoidance as preferences because they were made in the ordinary course of business.

At trial, the bankruptcy court heard testimony from three witnesses: (1) Susan Weirauch, office manager for Barrett Dodge; (2) Roseanne Nichols, a trade representative; and (3) William Perkins, a forensic accountant. Weirauch and

Nichols testified on behalf of Barrett Dodge. Perkins testified on behalf of Cranshaw. Weirauch testified as a fact witness that Barrett Dodge knew nothing of the financial difficulties of LeaseCo and undertook no unusual debt collection measures. Nichols testified, as an expert witness, that the average time to process lien releases was between 20 and 45 days. Perkins testified, as an expert witness, that between January and May 1996, LeaseCo made 651 direct purchases similar to the Barrett Dodge purchases, and 96 percent of those sales were closed within 40 days.

The bankruptcy court found that seven sales were in the ordinary course of business, but three sales, which took 54, 70, and 84 days to complete, were not in the ordinary course of business because they took longer than the industry average to close. Barrett Dodge appealed to the district court under 28 U.S.C. section 158(a). The district court reversed and held that the three sales were in the ordinary course of business between the parties, under section 547(c)(2)(B). The district court remanded the case to the bankruptcy court to determine whether the transactions were according to ordinary business terms under section 547(c)(2)(C).

On remand, the bankruptcy court found that the three transactions were not according to ordinary business terms. The bankruptcy court found that, even though the parties did not agree to an express time limit for payment, the industry

4

standard for payment was 20 to 45 days. On the second appeal by Barrett Dodge, the district court affirmed the ruling of the bankruptcy court. Barrett Dodge now appeals to this Court.

## II. STANDARD OF REVIEW

As the "second court of review of a bankruptcy court's judgment," this Court examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court. In re Club Assoc., 951 F.2d 1223, 1228 (11th Cir. 1992) (citation omitted). A determination of ordinary business terms under section 547(c)(2)(C) is a question of fact subject to the clearly erroneous standard of review. In re A.W. & Assoc., 136 F.3d 1439, 1441 n.7 (11th Cir. 1998); see also In re Roblin Indus., Inc., 78 F.3d 30, 41 (2d Cir. 1996); In re Yurika Foods Corp., 888 F.2d 42, 45 (6th Cir. 1989); In re U.S.A. Inns of Eureka Springs, 9 F.3d 680, 685 (8th Cir. 1993); In re Jan Weilert RV, Inc., 315 F.3d 1192, 1196 (9th Cir. 2003); Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172, 1177 (10th Cir. 1989). A conclusion by the district court that the factual findings of the bankruptcy court are "not clearly erroneous is normally entitled to some persuasive weight." Id. (citation omitted).

## III. DISCUSSION

Barrett Dodge makes the following three arguments in support of its defense

5

that its sales were according to ordinary business terms under section 547(c)(2)(C): (1) the bankruptcy court should have focused exclusively on the payment practices between the parties; (2) the bankruptcy court erred by holding that the prime bankruptcy policy of equal distribution among creditors was furthered by requiring Barrett Dodge to disgorge the transfers to the estate; and (3) the bankruptcy court erred by finding an implied time limit for the payment of sight drafts. We begin our analysis with a brief explanation of the preference statute and the defense of the ordinary course of business. We then address the arguments of Barrett Dodge.

### A. Preferences and the Ordinary Course of Business: Section 547(b) and (c)(2) of the Bankruptcy Code

The trustee of a bankrupt debtor can seek the return of certain transfers to creditors during the 90 days preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4). A preference is "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." Union Bank v. Wolas, 502 U.S. 151, 160-61, 112 S. Ct. 527, 533 (1991). The trustee avoids preferences to discourage creditors from "racing to the courthouse to dismember the debtor

during his slide into bankruptcy," and to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor." Id. at 161, 112 S. Ct. at 533. A creditor who received a greater payment than others of his class must disgorge so that all creditors may share equally. Id.

Under the defense established in section 547(c)(2), a creditor can prevent the disgorgement of assets transferred by the debtor in the "ordinary course of business":

> (c) The trustee may not avoid under this section a transfer –
> . . .
> (2) to the extent that such transfer was –
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms . . . .

11 U.S.C. § 547(c)(2). The purpose of the ordinary course of business defense is "to leave undisturbed normal financial relations," In re Craig Oil Co., 785 F.2d 1563, 1566 (11th Cir. 1986), which enables "the struggling debtor to continue operating its business." Wolas, 502 U.S. at 161, 112 S. Ct. at 533. A creditor who asserts this defense bears the burden of proving each of the three elements. In re A.W. & Assoc., 136 F.3d 1439, 1441 (11th Cir. 1998).

Although the first two elements of the defense pertain to the conduct of the

7

parties toward one another, the third element involves a broader inquiry. Id. at 1442-43. A creditor must show that the disputed transaction was made both in the course of regular dealings between the parties and in accordance with the standards of the relevant industry. Id. (citing In re Tolona Pizza Prods., Inc., 3 F.3d 1029, 1033 (7th Cir. 1993)). If the creditor fails to prove that the transfer conformed to the industry standard, then the trustee avoids the preference.

### B. Whether the Bankruptcy Court Properly Considered the Industry Standard

Barrett Dodge erroneously argues that the bankruptcy court should have considered whether the delays in payment were the result of "unusual debt collection or payment practices." Barrett Dodge argues that a transaction falls outside the range of ordinary business terms only when different payment terms have been established based on the financial difficulties of the debtor. Barrett Dodge contends that when the bankruptcy court determined that the parties did not alter their credit terms, no further determination of ordinary business terms was necessary.

The argument of Barrett Dodge ignores our holding in In re A.W. that a bankruptcy court must examine relevant industry standards when applying section 547(c)(2)(C). An objective inquiry regarding industry standards serves two

8

functions. First, it provides a basis "to evaluate the parties' self-serving testimony that an extraordinary transaction which was in fact intended as a preference towards a particular creditor was instead part of a series." In re A.W., 136 F.3d at 1442 n.10 (citation and internal quotation marks omitted). Second, it reassures other creditors "that deals have not been worked out favoring a particular creditor, which would permit a preference to slide under the section 547 fence." Id. (citation and internal quotation marks omitted). In re A.W. forecloses the argument by Barrett Dodge that the sole inquiry is whether the parties altered their credit arrangement. The bankruptcy court must consider evidence of industry standards.

Contrary to the argument of Barrett Dodge, we need not decide whether there is potential elasticity in the standard for ordinary business terms. Barrett Dodge cites In re Molded Acoustical Products, Inc., 18 F.3d 217, 226 (3d Cir. 1994), in which the Third Circuit reasoned that "when the parties have had an enduring, steady relationship . . ., the creditor will be able to depart substantially from the range of terms established under the objective industry standard." That may be true as far as it goes, but the record shows that Barrett Dodge and LeaseCo had a business relationship that lasted only six months. In the light of that record, the bankruptcy court had no choice but to evaluate their dealings strictly according

to industry standards under section 547(c)(2)(C).

### C. Whether the Bankruptcy Court Misinterpreted the Purpose of
### Section 547(c)(2) as Equal Distribution

Barrett Dodge argues that the bankruptcy court misinterpreted the purpose

of the preference statute in ruling that the prime policy of equal distribution among

creditors was furthered by allowing Cranshaw to avoid the transactions. Barrett

Dodge contends that the estate received valuable assets from Barrett Dodge in the

form of used cars. Barrett Dodge concludes that, because the estate was not

diminished, the transactions did not interfere with the distribution scheme of

bankruptcy.

This argument fails. Ensuring equal distribution among creditors is the

"more important" purpose of the preference statute. Union Bank, 502 U.S. at 161,

112 S. Ct. at 533. Even if the estate was not diminished by the transactions, the

analysis of Barrett Dodge is backward; the primary issue is not the enlargement of

the estate, but its division. A larger estate that is divided in favor of Barrett Dodge

does not serve the prime policy of bankruptcy: equal distribution. Had the

transactions not been avoided, Barrett Dodge would have retained a greater

percentage of the estate of LeaseCo than if Barrett Dodge had been forced to "take

10

pot luck with the rest of the debtor's unsecured creditors." Tolona Pizza, 3 F.3d at 1031.

The related argument by Barrett Dodge that LeaseCo received new value in the form of used cars also fails. Although a party may assert a "new value" defense to avoidability under section 547(c)(1) or (c)(4), that defense is irrelevant to the analysis of ordinary business terms. Section 547(c)(2)(C) involves only the ordinary transactions of the debtor and creditor and the industry standard.

*D. Whether the Bankruptcy Court Clearly Erred in Finding an Implied Time Limit for the Payment of Sight Drafts*

Barrett Dodge wrongly argues that the bankruptcy court erred in reading into the use of sight drafts by Barrett Dodge and LeaseCo a time limit for payment. Barrett Dodge failed to satisfy its burden of proving the absence of a time limit. See 11 U.S.C. § 547(g). The testimony of both expert witnesses at trial was that there was a standard time frame for these transactions, and that time frame was a key concern for a creditor. Nichols, the trade representative and the expert witness for Barrett Dodge, testified that sight drafts are held during the processing phase for an average of 20 to 45 days. Nichols conceded that, in her work for another dealership, "the boss got very angry" when delays in payment of 28 days or greater occurred. Nichols admitted that the boss demanded that employees "get these

11

things processed." The forensic accountant, Perkins, testified for Cranshaw that, during the relevant period, 96 percent of the purchases by LeaseCo were closed within 40 days. That expert testimony amply supported the finding of the bankruptcy court, and Barrett Dodge offered no evidence that its competitors ordinarily closed sales in more than 40 days.

It was reasonable for the bankruptcy court to consider whether some time limits were standard in the industry. A creditor who obtains unusually prompt payment from a debtor on the verge of bankruptcy could suspect the financial problems of the debtor and be attempting to gain an unfair advantage over other creditors. A creditor who tolerates unusual delays in payment from a debtor on the verge of bankruptcy may be dependent on the debtor and aiding the debtor in forestalling the inevitable to the detriment of less dependent creditors. Either way, "there likely would be a range of credit terms that one would consider to be normal, for example, payment within 30 to 40 days after receipt of an invoice." Advo-Sys., Inc. v. Maxway Corp., 37 F.3d 1044 (4th Cir. 1994). The finding by the bankruptcy court that the industry standard for payment was 20 to 45 days, therefore, was not clearly erroneous.

## IV. CONCLUSION

The record supports the finding that three sales between Barrett Dodge and

LeaseCo did not conform to the industry standard.  "We leave this case by case determination where it belongs – with the bankruptcy judge."  In re Gulf City Seafoods, Inc., 296 F.3d 363, 369 (5th Cir. 2002).  The judgment of the district court is, therefore,

**AFFIRMED.**