**In re GLOBE HOLDINGS, INC.; Globe Manufacturing Corp.; Debtor.**

**Dennis J. Buckley, Litigation Trustee, Plaintiff,**

v.

**Carrier Corporation, Defendant.**

**Bankruptcy Nos. 01–70115–CMS–11, 01–70116–CMS–11. Adversary No. 03–70005–CMS.**

United States Bankruptcy Court, N.D. Alabama, Western Division.

March 28, 2007.

---

Larry D. Henin, Stanley A. Bowker, Anderson Kill & Olick PC, New York, NY, William Dennis Schilling, Birmingham, AL, for Plaintiff.

R. Scott Williams, Haskell Slaughter & Young, Birmingham, AL, for Defendant.

Heather A, Lee, Burr & Forman LLP, Birmingham, AL, for Robert Gregory.

Lloyd Chandler Peeples, III, United States Attorneys Office, Jesse S. Vogtle, Jr., Balch & Bingham, Birmingham, AL, for Globe Holdings Inc.

## MEMORANDUM OF DECISION

C. MICHAEL STILSON, Bankruptcy Judge.

This matter was before the court on the complaint of Dennis J. Buckley, litigation trustee for Globe Holdings, Inc.; and Globe Manufacturing Corp., seeking to avoid allegedly preferential payments to defendant Carrier Corporation. The court, having reviewed the facts in the context of applicable law, finds that the trustee established that the payments were preferential pursuant to 11 U.S.C. § 547(b); and that Carrier failed to prove they were sheltered by the "ordinary course" defense of 11 U.S.C. § 547(c)(2). Judgment must be entered **IN FAVOR OF THE PLAINTIFF**; and **AGAINST THE DEFENDANT.**

## FINDING OF FACTS

Dennis J. Buckley, litigation trustee for Chapter 11 debtors Globe Holdings, Inc.; and Globe Manufacturing Corp. (Globe), filed this complaint on January 10, 2003, seeking to retrieve a total of $615,831.00 from Carrier Corporation. Buckley's suit seeks to have the court declare that two payments Globe made to Carrier on a contract are avoidable as preferences pursuant to 11 U.S.C. § 547(b).

Carrier raised two defenses to the complaint: (1) Carrier asserted that the trustee failed to show it received more because of the payments than it would have received in a Chapter 7, claiming the right to a mechanic's lien on Globe real estate; and (2) Carrier also asserted that these payments were made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

The court heard evidence and arguments of the parties at trial on November 1, 2006.

On June 6, 2000, Carrier executed a contract with Globe captioned CHILLER PLANT INSTALLATION AGREEMENT FOR GLOBE MANUFACTURING COMPANY. *See* Defendant's Exhibit 8. The parties contracted for Carrier to make major modifications to Globe's chiller system located at its Fall River, Massachusetts textile plant. There was also an agreement that the regional utility company would assist in the payment of the cost of the contract because of the energy savings to be accomplished by the upgrades.

Page 7 of Carrier's Exhibit 8 is a Schedule B setting out the payment schedule as follows:

1. $ 93,928.00 Equipment ordering-receipt of order (Interrogatory 9 showed this payment came 78 days after invoice.)

2. $162,072.00 State of work—piping materials and site mobilization (Paid 50 days after invoice, Interrogatory 9)

3. $250,000.00 Delivery of pumps, VFD's, cooling towers and heat exchanger (Paid 51 days after invoice, Interrogatory 9)

4. $365,831.00 Delivery of chiller units and air handler-construction progress (Paid 64 days after invoice, Interrogatory 9)

5. $270,121.00 Completion of chiller plant and AHU installation and start-up

6. $108,048.00 Final payment, project fully completed and commissioned

The trustee's lawsuit seeks to recover payments 3 and 4. (Payments 5 and 6 were made by the utility company directly to Carrier and are not at issue in this suit.)

Pursuant to the terms of the agreement all payments were due to Carrier "net 30 days from date of invoice." (Carrier Exhibit 8, page 1, paragraph 4). Carrier's Exhibit 10 is a copy of an invoice dated September 19, 2000 for the $250,000.00 installment called for under the agreement. Carrier's Exhibit 11 is a copy of another invoice, also dated September 19, 2000, in the amount of $365,831.00, the fourth payment called for on Schedule B.

Buckley introduced Carrier's answers to interrogatories into evidence as Plaintiff's

Exhibit B. In answer to Interrogatory 9, Carrier responded:

The first invoice to the Debtor, dated June 7, 2000, in the amount of Ninety Three Thousand Nine Hundred Twenty Eight and No/100 Dollars (U.S. $98,928.00) was paid by the Debtor in seventy Eight (78) days.

The second invoice to the Debtor, dated June 20, 2000, in the amount of One Hundred Sixty Two Thousand Seventy Two and No/100 Dollars(U.S. $162,072.00) was paid by the Debtor in fifty (50) days.

The third invoice to the Debtor, dated September 19, 2002, in the amount of Two Hundred Fifty Two Thousand and No/100 Dollars (U.S. $250,000.00) was paid by the Debtor in fifty one (51) days.

The fourth invoice to the Debtor, dated September 19, 2002, in the amount of Three Hundred Sixty Five Thousand Eight Hundred Thirty One and No/100 Dollars (U.S. $365,831.00) was paid by the Debtor in sixty four (64) days.

Globe Holdings, Inc., and its subsidiary, Globe Manufacturing Corp., filed Chapter 11 bankruptcy petitions in this court on January 13, 2001. (At the time, Globe operated a plant in Tuscaloosa, Alabama.) So Carrier's payments on the third and fourth invoices were made within 90 days of the filing of the bankruptcy petition. The court confirmed the debtors' joint Chapter 11 plan on January 23, 2002 after Globe assets had been liquidated.

The plan also provided for the establishment of a litigation trust to pursue residual claims and causes of action on behalf of certain Globe creditor groups. Buckley is trustee of the Globe Holdings, Inc. and Globe Manufacturing Corp. Litigation Trust, as successor in interest and representative of the Chapter 11 debtors. It was in that capacity that the trustee filed this preference lawsuit on January 10, 2003.

Paragraph 4 on page 1 of Carrier's Exhibit 8 states that "All material and work provided by Carrier pursuant to this Agreement is deemed to be an improvement to real property within any mechanic's lien provision applicable to the real property." The fact that these major components would fall within this contractual definition is not in dispute. The parties disagreed on the status Carrier would hold as a creditor under Massachusetts law. Following Globe's payments 3 and 4, it took no steps to create or perfect a mechanic's lien in the real estate.

Carrier's service representative Chris O'Connor testified on the nature of the contract and payments under the terms of this and other Carrier contracts. O'Connor said that the documents showed Carrier's Exhibit 10 was paid approximately 50 days after the date of invoice, and that Carrier's Exhibit 11 was paid approximately 60 days after the date of the invoice.

He also testified that while all Carrier contracts have the net–30–days provision, the term is not complied with. O'Connor did testify that Carrier tracks payments and described what Carrier characterized as a "date sales outstanding figure" (DSO) figure which tracks how long it takes customers to pay invoices. He stated that the average DSO in the eastern region of the United States was only 44 days, shorter than the actual DSOs on the contested payments.

O'Connor testified that Carrier's credit and collection department tracked payments on accounts, and the department contacted him only when a problem arose. He said he never heard anything from credit and collection about the Globe account. He did testify that credit and collection became nervous at about 90 days after an unpaid invoice, and would take

enforcement action such as stopping work on a job. Nothing happened on the Globe account to his knowledge, he said.

David Witham also testified on behalf of Carrier. Witham is a professional engineer by training and was employed by Carrier as project manager on the Globe job. He testified that over the last 10 years he has handled 50 to 60 similar jobs involving utility companies and company plant modifications.

In his role as project manager, Witham said he would generally approve invoices for payment by owners; and would hear from contractors if they were not paid. He testified that he did not know when invoices were mailed or when they were paid. His general sense of payment activity came only when unpaid contractors complained, he said. He referred to the sending of invoices and receipt of payments as "back office work", and not something he dealt with directly.

Witham testified that 45- to 60-day delay between invoicing and payment was usual in this industry. Anything over 60 days and people began to get concerned, he said. A lag of 90 days or more would be outside the range of normal payment practices in this industry, he said.

At the conclusion of the November 1, 2006 hearing, the court allowed the parties to submit post-trial briefs, taking the case under submission for a decision as of December 13, 2006.

## CONCLUSIONS OF LAW

This court has jurisdiction of Globe's liquidating Chapter 11 case pursuant to 28 U.S.C. § 1334(a). The court has jurisdiction of this lawsuit, a core bankruptcy proceeding arising under the Bankruptcy Code, pursuant to 28 U.S.C. § 1334(b). Jurisdiction is referred to this Bankruptcy Court by the General Order of Reference of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

### I.

### *The trustee has met his burden of showing that all elements of an avoidable preference under 11 U.S.C. § 547(b) are present in these payment transactions.*

The trustee brought this action asserting that the Globe's payments to Carrier on invoices in Exhibits 10 and 11 were preferential transfers within the meaning of 11 U.S.C. § 547(b). Section 547(b) provides the following:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

As stated in *Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re LeaseCo)*, 389 F.3d 1205, 1209 (11th Cir. 2004):

> The trustee of a bankrupt debtor can seek the return of certain transfers to creditors during the 90 days preceding the filing of the bankruptcy petition.... A preference is "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 ... (1991).

Pursuant to 11 U.S.C. Section 547(g)[1], the trustee has the burden of proving all elements of Section 547(b). The burden of proof on core proceedings under the Bankruptcy Code is a preponderance of the evidence, as applicable generally to federal civil actions.

The only element of Section 547(b) which is in dispute is the subparagraph 5 requirement, or what is known as the "liquidation test." Carrier contended that the trustee has failed to show that Carrier received more because of the challenged payments than it would have received in Chapter 7 liquidation if the transfers had not been made. Carrier asserted that it held mechanic's lien rights which would have prevailed in a Chapter 7 case, guaranteeing that it would still receive the total amount of the contract. In other words, it contended that it was a creditor fully secured by a first priority lien in Globe real estate.

The Section 547(b)(5) analysis requires the court to treat the transfers as not having been made (no payments made on the two disputed invoices), and then to examine the status of Carrier's claim as of January 13, 2001, the date the bankruptcy petition was filed.

Under this analysis, Carrier would be unpaid for the invoices reflected in Carrier's Exhibits 10 and 11 and its right to payment would be determined by the Bankruptcy Code. If this right to payment under the Bankruptcy Code is as much or more than the amount paid, then Section 547(b)(5) has not been proved by the trustee. However, property rights are generally defined by state law, triggering consequences in bankruptcy distribution. The law of Massachusetts, on the creation and priority of liens in real estate, must apply in these facts.

Under Massachusetts law, (1) Carrier held no mechanic's lien rights in Globe property as of the petition and (2) Even if Carrier had properly perfected a lien, there would have been no equity for it to attach to. But for the two disputed payments, Carrier's obligation from Globe was an unsecured debt, whether in Chapter 11 or Chapter 7.

First, regardless of the reason, Carrier did not take the steps required to make it a secured creditor against other claimants (including the trustee) as provided by Massachusetts General Laws Annotated (M.G.L.A.) 254 §§ 1, et *seq.* For under Massachusetts law, in order to perfect a mechanic's lien, it would have been necessary for Carrier to record a notice of its lien in the appropriate office and ob-

---

1. **11 U.S.C. 547(g)** provides the following:

 For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section.

serve other formalities to enforce it. This was not done.

■ Under Massachusetts law, a mechanic's lien is a creature of statute rather than of common law, and requirements are strictly construed by courts in that state. *See Golden v. General Builders Supply LLC,* 441 Mass. 652, 807 N.E.2d 822, 824 (2004); *Tremont Tower Condominium LLC v. George B.H. Macomber Company,* 436 Mass. 677, 767 N.E.2d 20, 23 (2002); *Mammoet USA, Inc. v. Entergy Nuclear Generation,* 64 Mass.App.Ct. 37, 831 N.E.2d 349, 355 (2005); and *National Lumber Company v. Lombardi,* 64 Mass. App.Ct. 490, 834 N.E.2d 267, 269–70 (2005), *review denied,* 445 Mass. 1106, 836 N.E.2d 1096 (2005).

> Because a mechanic's lien is purely a creation of statute, we have consistently required exact compliance with the statute in order to create, perfect, and enforce such a lien. *See Ng Bros. Constr. v. Cranney,* 436 Mass. 638, 642, 644, 766 N.E.2d 864 (2002); *National Lumber Co. v. LeFrancois Constr. Corp.,* 430 Mass. 663, 666, 723 N.E.2d 10 (2000); *East Coast Steel Erectors, Inc. v. Ciolfi,* 417 Mass. 602, 605, 632 N.E.2d 397 (1994); *Mullen Lumber Co. v. Lore,* 404 Mass. 750, 752, 537 N.E.2d 123 (1989). "The [mechanic's lien] statute is strictly construed against the party claiming the lien." . . .

*Golden,* 807 N.E.2d at 824.

■ Carrier also argued that it should be entitled to an equitable lien since it could have perfected its mechanics lien if it had not been paid. Carrier asserted that it has an "inchoate" mechanics lien within the meaning of a U.S. District Court's interpretation in *Official Committee of Unsecured Creditors of 360Networks (USA) Inc., et al. v. AAF–McQuay, et al. (In re 360Networks USA Inc.),* 327 B.R. 187 (Bankr.S.D.N.Y., 2005). As noted in

*360Networks,* 327 B.R. at 189, under New York state law "a statutory lien that could have been timely perfected under applicable State law is called an 'inchoate' mechanics lien." The underlying basis of the court's holding in *360Networks* was that if the creditor had perfected its lien, instead of being paid, it would have been a fully secured creditor in the hypothetical chapter 7 case.

> Under § 547(b)(5), a transfer to a fully secured creditor is immunized from preference attack because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral.

*360Networks,* 327 B.R. at 190.

■ Fully secured creditors who receive payments cannot be preferred creditors within the meaning of Section 547(b)(5). However, it does not appear to the court that the same New York rule would apply to Massachusetts real estate. *See Admiral Drywall, Inc. v. Cullen,* 56 F.3d 4 (1st Cir.1995):

> In *Ehrlich v. Johnson Service Co.,* 272 Mass. 385, 172 N.E. 508 (1930), a general contractor, within four months of bankruptcy paid some of its subcontractors, and its trustee in bankruptcy sued to recover. Defendants claimed they had equitable liens. The court held that, in the absence of any special contract, they had none, and hence the payments to them were voidable preferences. Plaintiffs here, who likewise have no protection of a surety, and no special contract otherwise, can escape foreclosure of their equitable claim only by persuading us that *Ehrlich* is no longer law.

The record of this Chapter 11 case shows that Globe's Massachusetts real estate was already encumbered by a mortgage to the secured Lender Group which had been

perfected in 1998. Carrier did not begin the Globe chiller remodeling until 2000. Under Massachusetts law, even perfected mechanics liens cannot prime mortgage liens unless the work was commenced *before* recordation of the mortgage. That did not take place in this case. Consequently, the value of Carrier's lien would have been zero on the petition date.

M.G.L.A. 254 § 7(a) provides:

No lien under section one shall avail against a mortgage duly registered or recorded unless the work or labor performed is in the erection, alteration, repair or removal of a building, or other improvement to real property which erection, alteration, repair, removal, or improvement was actually begun prior to the recording of the mortgage.

Carrier mechanic's lien, even if perfected, would still have been subordinate to the prior perfected mortgage lien which exceeded the value of the real estate. Even a properly recorded lien would have been worthless, because there was no equity left for it to attach to.

Carrier has asserted that it could have requested a subordination of this first lien, but, in fact, it did not do so. The first lienholder on Globe property was a Lender's Group that was the major secured, but undersecured, creditor in the Chapter 11. There is no evidence that these lenders would have granted Carrier's request. Carrier has cited no case that suggests that an inchoate mechanics lien should be applicable when anything other than perfection of the lien is required in place of payment.

 Carrier was paid 100% of its prepetition unsecured claim. Globe was liquidated and other prepetition unsecured creditors were not paid in full. Therefore, because of the payments, Carrier received more that it would have received in a case under Chapter 7. Consequently, the court finds that the trustee has proven that the two payments within 90 days of Globe's bankruptcy do comprise avoidable preferences in the meaning of Section 547(b).

## II.

***Carrier has failed to show that the preferential payments are shielded from avoidance under Section 547(c)(2), the ordinary course of business defense.***

Even when all elements required for a preferential transfer are present, the payee may retain the payment if it can prove entitlement to one of the exceptions to avoidance provided by Section 547(c). These exceptions operate as affirmative defenses.

Carrier has contended that, if the court determines the two disputed transfers were preferential under Section 547(b), the payments are still protected from avoidance by Section 547(c)(2), commonly referred to as the ordinary course of business defense. Pursuant to Section 547(g), Carrier has the burden of proof in this defense.

Section 547(c)(2) was modified by the sweeping 2005 amendments to the Bankruptcy Code (BAPCPA). However, the trustee's case was commenced prior to the October 17, 2005 effective date of BAPCPA, and is governed by the prior statute and the case law interpreting it. Section 547(c)(2) the provided as follows:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; ...

■ A creditor must prove that all three elements of Section 547(c)(2)—(A), (B), and (C) are present in the transaction to attain this exception. As stated in the Eleventh Circuit's *LeaseCo.* case, 389 F.3d at 1210:

> The purpose of the **ordinary course of business** defense is "to leave undisturbed normal financial relations," *In re Craig Oil Co.*, 785 F.2d 1563,1566 (11th Cir.1986), which enables "the struggling debtor to continue operating its business." [*Union Bank v. ]Wolas*, 502 U.S. [151] at 161, 112 S.Ct. [527] at 533[, 116 L.Ed.2d 514 (1991) ]. A creditor who asserts this defense bears the burden of proving each of the three elements. *In re A.W.[ & Associates, Inc.]*, 136 F.3d [1439] at 1441 [11th Cir.1998].

*See also Tolz v. Gawlick (In re Forex Fidelity International)*, 2007 WL 30096 *2 (11th Cir.2007); and *Tolz v. Hardin (In re Forex Fidelity International)*, 2007 WL 30098 *2 (11th Cir.2007), cited as unpublished persuasive authority only under *CTA11 Rule 36–2.*

There is no dispute that the payments at issue relate to a "debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" as provided in 547(c)(2)(A). Nor is it disputed that both payments were made more than the 30 days after invoice allowed by the language of the contract.

The dispute arises under Section 547(c)(2)(B) and (C). Subsection B involves a subjective analysis of the course of dealing between the two parties to the suit; while subsection C involves a broader objective inquiry. Carrier has failed to meet its burden of proof under either Section 547(c)(2)(B) and 547(c)(2)(C).

**A. Section 547(c)(2)(B)—"... [T]he ordinary course of business or financial affairs of the debtor and the transferee; ..."**

■ The analysis under Section 547(c)(2)(B) is referred to as the "subjective" test because it relates solely to dealings between the debtor and the creditor. *See Fiber Lite Corporation v. Molded Acoustical Products, Inc., (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 223–28 (3rd Cir.1994). In the Carrier case, there is no evidence of a long-term relationship between the debtor and creditor, or of an ongoing history of invoicing and payments that can be reviewed and compared to the disputed transactions. The dispute arises from one contract for a major capital improvement that Globe and Carrier entered in the late spring/early summer of 2000. All transactions directly between the parties were concluded before Globe filed bankruptcy.

Globe made two payments prior to the 90–day preference period; and two more during the preference period. In response to the trustee's Interrogatory 9, Carrier answered that the first invoice to Globe, dated June 7, 2000, was paid in 78 days, or about August 24, 2000. The second invoice to Globe, dated June 20, 2000, was paid in 50 days, or approximately on August 9, 2000, 14 days before the first invoice was paid. The 90–day preference period had not begun.

Globe paid the third invoice in 51 days, and the fourth invoice in 64 days, both clearly within the preference period. (The last two invoices called for under the terms of the contract were paid by the regional utility company directly to Carrier and are not in issue in this suit.)

In cases where the parties have no history of dealing, courts have taken two approaches in applying Section 547(c)(2)(B). One approach is that if there is no prior course of dealing between the parties before the preference period, then there is nothing with which to compare course of conduct during the preference period. Under this interpretation, payments outside the terms of the contract would not be ordinary between the parties. *See Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload, Inc.)*, 152 B.R. 690 (Bankr.N.D.Ga.1992). The *Brown Transport* case cited *Marathon Oil Company v. Flatau (In re Craig Oil Company)*, 785 F.2d 1563 (11th Cir. 1986) in support of this holding. The Eleventh Circuit had noted in *Craig* that "untimely payments are more likely to be considered outside the ordinary course of business and avoidable as preferences."

In *Miller v. Florida Mining and Materials (In re A.W. & Associates, Inc.)*, 136 F.3d 1439 (11th Cir.1998), the Eleventh Circuit distinguished and expanded *Craig*. In that case, the court determined that bankruptcy courts are also required to consider any industry standards offered by a defending creditor under Section 547(c)(2)(C), as well as to require proof of Section 547(c)(2)(B).

The Seventh Circuit in *In the Matter of Xonics Imaging, Inc.*, 837 F.2d 763 (7th Cir.1988), cited *Craig* to hold "that the conduct of a debtor, after becoming insolvent, in failing to make payments within the time required by his contract with the creditor is presumptively nonordinary." *Xonics*, 837 F.2d at 767. The court found the contested payments not to be ordinary.

The Sixth Circuit in *Logan v. Basic Distribution Corporation (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239 (6th Cir.1992) also discussed 547(c)(2)(B) when there was limited prior history of payments between the parties. In *Logan* there had been a pre-preference period history of five months of payments on credit terms of "net 30 days". The court noted that subsection B requires proof "that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor." *Logan*, 957 F.2d at 244. The court cited both the *Craig* and *Xonics* cases, noting that "tardiness of the payments and whether they satisfied the terms of the agreement between the parties are important factors in the determination of whether the payments were ordinary. Failure to make a payment within the time limit set forth in the contract is presumptively 'nonordinary' ". *Logan*, 957 F.2d at 244. That court also held the disputed payments not to be ordinary.

However, the court in *Logan* did note that the decision of whether or not payments were ordinary should not be based solely on the terms of the contract, but should also take into account the parties' past conduct. "If the parties had engaged in a long-term credit account relationship with the debtor making comparable payments throughout, the bankruptcy court might have concluded that such payments were 'ordinary' notwithstanding the written credit terms." *Logan*, 957 F.2d at 245.

■ Analysis of pre-preference period conduct is required to determine if the terms of the contract (in this case payment due in 30 days) were effectively amended during the pre-preference period by conduct ratifying late payments so they would be deemed ordinary under a modified contract. *See Xonics*, 837 F.2d at 766.

Other courts have held that, in the absence of a history of prior dealings between the parties, the court can consider the history of dealings between the debtor and third parties; and the creditor and

third parties. *See Styler v. Landmark Petroleum, Inc. (In re Peterson Distributing, Inc.)*, 197 B.R. 919, 926 (D.Utah 1996). There is no bright-line rule for the number of payments prior to the preference period required to establish a course of dealing between parties.

Carrier offered no objective evidence of a history of dealings between Globe and other creditors outside the preference period. O'Connor's testimony that Carrier's "day sales outstanding" DSO statistic showed other customers in the eastern region, on average, pay Carrier within 44 days after invoice, or more timely than Globe. That evidence cuts against Carrier, since the contested transfers were outside the 44 days, and thus "presumptively non-ordinary". *Xonics*, 837 F.2d at 767.

While the Section 547(c)(2) defense is not limited to trade creditors, most of the cases have involved trade vendors who have supplied the debtor products over a period of time prior to bankruptcy. *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)

The Globe/Carrier transaction is very different. The payments were not on trade debt, but stem from a negotiated contract for a major capital improvement project, specifically scheduling four payments to be made by the debtor at various stages of the job. The contract is fourteen pages long. (Defendant's Exhibit 8) Terms, including the 30–day payment requirement, were negotiated between the parties. That 30–day term did not originate as a mere preprinted due date on invoice forms.

The terms of the contract provided payments were due within 30 days of the invoice. The payments in dispute were paid outside the terms of the contract. The *Xonics* court would characterize these as "presumptively not ordinary". The Sixth Circuit in *Logan* held that a long

history of dealing between a debtor and creditor could counteract the literal terms of the contract, but that a short course of dealing "was insufficient to compensate for the clear terms of the contract." *Logan*, 957 F.2d at 244. The 90 day preference period in this case began to run approximately October 13, 2001. The two payments made outside the preference period were within approximately 60 days of the preference period. This limited history of payments does not evidence that the parties effectively modified their originally negotiated terms.

**B. Section 547(c)(2)(C)—". . . [M]ade according to ordinary business terms; . . ."**

If Carrier had been able to show that the two payments were ordinary between Globe and Carrier, Carrier would still be required to prove that the payments were made "according to ordinary business terms" in the meaning of Section 547(c)(2)(C). The Eleventh Circuit in the *A.W. & Associates* case (136 F.3d at 1442–43) quoted the Seventh Circuit Court of Appeals *In the Matter of Tolona Pizza Products Corporation*, 3 F.3d 1029 (7th Cir.1993) to find that proof of Section 547(c)(2)(C), as well as of Section 547(c)(2)(B), is necessary to protect preferential transfers:

> We conclude that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Tolona Pizza*, 3 F.3d at 1033.

The court in *A.W. & Associates* also cited the Third Circuit's *Fiber Lite Corporation v. Molded Acoustical Prod-*

*ucts, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217 (3rd Cir.1994), which considered the duration of the parties relationship when considering a Section 547(c)(2) defense. *Molded Acoustical Products* held at 18 F.3d at 225:

> ... [W]e adopt the following rule of construction as an aid to resolving these problems: the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)....

> When the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry....

As noted above, the Globe/Carrier transaction is not a relationship which has been "cemented" by the passage of time. It is a new relationship and thus requires close scrutiny.

While Section 547(c)(2)(B) is referred to as a "subjective" test since it relates to the actual dealings between the specific parties, Section 547(c)(2)(C) is an "objective" test based on normal billing practices within the relevant industry. *See Molded Acoustical Products*, 18 F.3d at 223–28. However, courts have held that a creditor has failed to show objective evidence of an industry standard where the fact was too general. *Advo–System, Incorporated v. Maxway Corporation*, 37 F.3d 1044, 1051 (4th Cir.1994).

The only evidence of industry norms offered by Carrier was Witham's testimony, and Witham could only testify to his general sense of what was going on in the industry based on his limited knowledge.

He stated he learned of problems when people came to him because they were not getting paid. His testimony that a 45–60–day lag time was usual was based only upon such inquiries about unpaid invoices. Witham did state that people were concerned when payments were outside 60 days. However, he testified that he had no personal knowledge of when invoices were mailed out, or when they were actually paid. Further, his general sense of what was going on is not consistent with Carrier's own accounting department's records showing that it receives payment, on average, in 44 days after invoice in the eastern region of the United States.

The Fourth Circuit Court of Appeals discussed the level of proof required under 547(c)(2)(C) in its *Advo–System* opinion. The court held:

> Rather than presenting specific credit terms representative of its norm, *e.g.,* the manner, form, amount, and timing of its customers' credit payments to it, Advo offers a more general characterization of its norm in an effort to satisfy subsection C's objective standard ... Were creditors allowed to characterize the industry norm at such a high level of generality, subsection C would become virtually meaningless.

*Advo–System*, 37 F.3d at 1051.

A Delaware bankruptcy court also held in *Morris v. Sampson Travel Agency, Inc., et al. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 393 (Bankr.D.Del.2005) that courts should reject evidence of an industry standard when it is too general and should look for "objective, definitive evidence supported by specific data to meet the burden of proof."

In this context, the court must also find that Witham's general sense of what is going on in the industry does not meet the burden required by Section 547(c)(2)(C).

The court finds that Carrier has failed to meet its burden of proving it is entitled to the Section 527(c)(2) defense because it has failed to prove two of three elements required for such a finding.

### III.

### *The court must decline to award the trustee prejudgment interest against Carrier in this case.*

The Bankruptcy Code does not specifically provide for the award of prejudgment interest in actions brought pursuant to its provisions, but neither does it forbid such awards. Prejudgment interest has been awarded on core bankruptcy judgments in some courts. As the 10th Circuit stated in *Turner v. Davis, Gillenwater & Lynch et al. (In re Investment Bankers, Inc.)* 4 F.3d 1556, 1566 (10th Cir.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994):

> In the absence of a statutory provision to the contrary, prejudgment interest may generally be awarded if 1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable.

The 10th Circuit was citing an earlier securities fraud case *Anixter v. Home–Stake Production Company, et al.*, 977 F.2d 1549, 1554 (10th Cir.1992) for this holding. In that case, the court had pointed out that prejudgment interest was available, but it was not mandatory "as a matter of right." *See also Sigmon v. Royal Cake Company, Incorporated (In re Cybermech Incorporated)*, 13 F.3d 818, 823 (4th Cir.1994) (no longer good for a point of law unconnected with prejudgment interest); and *Friedkin v. Sternberg (In re Sternberg)*, 85 F.3d 1400 (9th Cir.1996). As stated in *Sternberg*, 85 F.3d at 1408:

Bankruptcy courts traditionally award prejudgment interest from the time the claimant makes a demand on his or her claim or initiates an adversary proceeding.

It appears that the Eleventh Circuit has not addressed the specific issue of prejudgment interest in the context of a trustee's Bankruptcy Code Section 547(b) preference action against a creditor. It did address the issue more generally in *Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591 (11th Cir.1986). *Parker Towing* was adjudicated in the highly specialized arena of admiralty law where prejudgment interest generally should be awarded. Nevertheless, the court of appeals did note that the existence of a genuine dispute concerning liability can warrant its denial.

In this preference action, the trustee's rights to file the preference action accrued as of January 13, 2001, when Globe filed bankruptcy. Globe management functioned as trustee in its debtor-in-possession role prior to its January 23, 2002 confirmation. This adversary proceeding was not filed until January 10, 2003 and trial was not held until November 1, 2006.

However, neither party adduced evidence of when, or even if, an earlier trusteeship made a demand on Carrier before this lawsuit was filed. There was no evidence that fraudulent or other improper conduct by Carrier contributed to its obtaining the money or to creating this delay.

Further, there was a genuine dispute between the parties as to whether or not a preferential transfer had been made under 547(b); and a genuine dispute as to whether or not the payments were entitled to the protection of Section 547(c) defenses. The trustee used a legally colorable offensive tactic when he filed the suit, and so did Carrier when it defended. Both were operating on logical business judgments

considering the interests they represent. There is no evidence in this record that the fault for the delay can be attributed to either the trustee or Carrier.

For these reasons, the court must decline to award prejudgment interest against Carrier as sought by the trustee.

## CONCLUSION

Plaintiff Dennis J. Buckley, as litigation trustee, has proven payments totaling $615,831.00 made by Globe Manufacturing Corp. to defendant Carrier Corporation should be avoided as preferential transfers pursuant to 11 U.S.C. § 547(b). The court finds that Carrier failed to meet its burden of showing that the payments should be sheltered from avoidance by 11 U.S.C. § 547(c)(2). Judgment must be entered **IN FAVOR OF THE PLAINTIFF;** and **AGAINST THE DEFENDANT.**

An order, consistent with these findings pursuant to Fed. R. Bankr.P. 7052, will be entered separately.

**DONE and ORDERED**