Mammoet USA, Inc. v. Entergy Nuclear Generation Company.

MAMMOET USA, INC.[1] vs. ENTERGY NUCLEAR GENERATION
COMPANY.

No. 04-P-249.

Plymouth. December 13, 2004. - July 18, 2005.

Present: GREENBERG, LAURENCE, & COHEN, JJ.

*Mechanic's Lien. Statute,* Construction. *Words,* "Improvement".

A subcontractor's transportation and delivery of a large piece of equipment (a
used transformer owned by a nuclear power plant) to the power plant site
and the placement of that equipment by the subcontractor onto a concrete
pad, where it was stored as spare or backup equipment for possible future
use at the power plant, did not constitute an "improvement of real
property" entitling the subcontractor to a mechanic's lien under G. L.
c. 254, § 4. [40-50]

CIVIL ACTION commenced in the Superior Court Department on
March 7, 2002.

The case was heard by *Paul E. Troy,* J., on a motion for sum-
mary judgment.

*Douglas B. Otto* for the plaintiff.

*James B. Re* for the defendant.

LAURENCE, J. This case presents the following question under
a provision of the mechanic's lien statute, G. L. c. 254, § 4[2]:
Does a subcontractor's transportation and delivery of a large
piece of equipment (a used transformer owned by a nuclear
power plant) to the power plant site and the placement of that
equipment by the subcontractor onto a concrete pad, where it
was stored as spare or backup equipment for possible future use
at the power plant, constitute an "improvement of real property"

---

[1]As successor in interest to Mammoet USA, Inc., and Davenport Mammoet
Heavy Transport, Inc.

[2]The relevant statutory language appears at note 11, *infra.*

entitling the subcontractor to the statutory lien? A judge of the Superior Court concluded that it does not. We agree and affirm the judgment.

*Factual background.* The underlying facts are not in dispute. The defendant, Entergy Nuclear Generation Company (Entergy), a Delaware corporation, operates the Pilgrim Nuclear Power Station (power plant) in Plymouth. In December, 2000, Entergy purchased a piece of equipment known as a transformer from a company called NSTAR to serve as a spare or backup transformer in the event the transformer currently in use at the power plant should need repair or become inoperable. A transformer is a large (twelve feet wide by twenty-one feet long by twenty-two feet high) and extremely heavy (376 tons) steel box that is essential to the operation of the power plant. Its purpose, when connected to the power plant's generator, is to increase the voltage of the electricity, produced by the generator at 22.8 kilovolts, to 345 kilovolts, at which voltage the electricity is transferred to various substations, where it is again transformed and distributed to the power plant's customers.[3]

In November, 2001, Entergy contracted with Ohio Transformer, Inc. (Ohio Transformer),[4] to pick up the transformer Entergy had purchased almost a year earlier, which was then located at the Millstone Nuclear Power Station in Waterford, Connecticut, deliver it to the power plant, set it on an existing concrete storage pad near (but not next to or connected to) the generator, and "dress" it. ("Dressing" a transformer is a process of putting it in a state of readiness for use and involves attaching various pumps, fans, bushings, and other components to it and filling it with 17,000 gallons of mineral oil.) Entergy agreed to pay Ohio Transformer $520,463 for transporting, delivering, and dressing the transformer.[5] Ohio Transformer, in turn, subcontracted with the plaintiff, Mammoet USA, Inc. (Mam-

---

[3] The record is silent as to the expected useful life or operational reliability of such a transformer.

[4] Ohio Transformer, Inc., an Ohio corporation, was then in the business of general contracting and repairing of nuclear generators.

[5] The cost of the transportation was $388,000, and the cost of the dressing was $132,463.

moet)[6] later in November, 2001, to "transport transformer from Millstone Power Plant via truck and barge to Pilgrim Power Plant and set on pad," for which Ohio Transformer agreed to pay Mammoet $312,640.

Mammoet completed its performance of those services on or about December 1, 2001. Although it did not "dress" the transformer as part of its contractual obligations with Ohio Transformer,[7] Mammoet "rough-set" it onto a concrete storage pad located at the power plant. This rough-setting process required a high degree of sophistication and expertise in engineered heavy lifting.[8] Because the transformer was brought to the power plant for the purpose of serving as a spare transformer, it was not connected to the generator at the time of the delivery and rough-setting.[9]

Entergy paid Ohio Transformer in full for the services performed by Ohio Transformer and Mammoet. Before Mammoet was paid pursuant to its subcontract with Ohio Transformer, however, Ohio Transformer filed for bankruptcy and never paid Mammoet anything. Mammoet then commenced the instant action against Entergy seeking to enforce the mechanic's lien it had established by filings in the Plymouth County registry of deeds in February, 2002, to recover the $312,640 it was owed for the services it had performed in picking up and delivering the transformer and rough-setting it onto the storage pad at the power plant. On Entergy's motion, a judge of the Superior Court discharged Mammoet's mechanic's lien and granted Entergy summary judgment.[10]

---

[6]Mammoet, a Delaware corporation, is in the business of providing heavy lifting and transportation services in the petrochemical, power construction, and offshore industries.

[7]Ohio Transformer itself performed the dressing services required under its contract with Entergy, in June, 2002.

[8]The rough-setting spanned a twenty-four hour period and involved the use of various equipment, including a jack and slide system, trucks, forklifts, cranes, and a transporter system, whereby the transformer was slid onto the storage pad using the jack and slide system, and was then jacked down into a rough position on the pad.

[9]It is unclear from the record whether Entergy has ever connected or used the transformer.

[10]The judge stated the issue to be "whether the work performed by Mammoet constitutes [under the mechanic's lien statute, G. L. c. 254,] the furnish-

*Discussion.* Mammoet claims that the judge erred in failing to recognize that it was entitled to protection under the mechanic's lien statute[11] because it "furnished labor or materials in connection with the improvement to [Entergy's] real property" and "improved the value of" that property. Entergy

_____

ing of labor and/or materials in connection with the 'improvement to real property,' " and recognized that certain 1996 amendments to G. L. c. 254, discussed *infra* at note 16, had been generally "intended to broaden and expand the type of work and the type of entities entitled to claim mechanics liens." But he could "not interpret the Legislature's intent so broadly as to include the delivery and placing of a . . . [transformer] on a storage pad (no matter how extensive the work required) as . . . entitled to the protection of a mechanic's lien because it is not an improvement to the land" within the meaning of the statute. "[I]t is . . . an inoperable piece of equipment that may be sold or otherwise never used. It is not attached to or even located next to the Pilgrim Station's electricity generator."

[11]The pertinent language of G. L. c. 254, § 4, as amended through St. 1996, c. 364, § 5, provides:

> "Whoever furnishes labor, including subcontractor construction management services, or who furnishes material, or both labor and material, or furnishes rental equipment, appliances or tools, under a written contract with a contractor, or with a subcontractor of such contractor, may file or record . . . a notice of his contract substantially in the following form:
>
> "Notice is hereby given that by virtue of a written contract dated _____, between _____ contractor (or subcontractor) and _____ said _____ is to furnish or has furnished labor or material, or both labor and material, or is to furnish or has furnished rental equipment, appliances or tools, *in the erection, alteration, repair or removal of a building, structure or other improvement of real property* by _____ contractor, for _____, owner, on a lot of land or other interest in real property described as follows:
>
> ". . .
>
> "Upon filing or recording a notice, as hereinbefore provided, and giving actual notice to the owner of such filing, the subcontractor *shall have a lien upon such real property, land, building, structure or improvement* owned by the party who entered into the original contract . . . to secure the payment of all labor and material and rental equipment, appliances or tools which he is to furnish or has furnished *for the building or structure or other improvement . . . .*" (Emphasis added.)

The parties' arguments also touch upon §§ 1 and 2 of the statute, which contain substantially similar language, but § 1 only deals with those performing personal labor and excludes persons covered by § 4, while § 2 essentially deals with contractors ("[a] person entering into a written contract with the owner of any interest in real property [or his agent]"), not subcontractors.

counters that Mammoet merely transported a piece of Entergy's personal property from one location to another, where it is kept in storage as spare equipment. That does not, Entergy argues, satisfy the statutory requirement of being engaged in work related to an "improvement of real property," but rather constituted work no different in kind than delivering a backup computer for Entergy to keep in reserve on a shelf in a storeroom in case its functioning computer fails. Neither party benefits from any Massachusetts appellate decision construing the term "improvement" as used in the statute, which we are therefore obliged to address.[12]

As always in such matters, our goal is to ascertain the Legislature's intent in using that term, and any analysis must begin with the actual language of the statute. Unfortunately, the term is undefined in the statute, and we know of no pertinent legislative history to assist us. The words of the statute nonetheless do afford helpful insight.

The familiar rule of construction known as ejusdem generis is applicable and indicates a more limited contextual meaning for a word that in isolation might appear general or broad. That doctrine provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " *Banushi* v. *Dorfman*, 438 Mass. 242, 244 (2002), quoting from 2A N.J. Singer, Sutherland Statutory Construction § 47.17, at 273-274 (6th ed. rev. 2000). In other words, we "treat[] a general, all-encompassing word at the end of a list of specific items as taking on the character of those specific items." *Ferguson* v. *Host Intl., Inc.*, 53 Mass. App. Ct. 96, 103-104 (2001). "The doctrine is most appropriate when a series of several terms is listed that concludes with the disputed language." *Banushi* v. *Dorfman, supra.*

Here, each of the words that precedes "improvement" in G. L. c. 254, § 4, i.e., "building" and "structure," in common

---

[12]In an appeal reviewing a grant of summary judgment, such as this, with the undisputed facts being viewed in the light most favorable to Mammoet, Entergy's entitlement to judgment as matter of law, see *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), depends on the interpretation of that key term. See *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 764 n.2 (2000).

parlance connotes something that has been constructed or as-
sembled out of a combination of materials or parts to form a
physical object purposefully created for human habitation or for
use in the place where it has been assembled.[13] This more
limited connotation for the associated term "improvement" is
reinforced by the statutory references to "construction manage-
ment" and "general contractor" services as principal types of
work for which a lien may be claimed. See G. L. c. 254, §§ 2,
4. Perhaps most persuasive is the fact that such a narrowing of
the scope of an "improvement," to something construction-
related, fairly comes within the lien statute's underlying "spirit
and intent," *Perlera* v. *Vining Disposal Serv., Inc.*, 47 Mass.
App. Ct. 491, 496 (1999), quoting from *Kenney* v. *Building
Commr. of Melrose*, 315 Mass. 291, 295 (1943), which is "to
[be] . . . a vehicle to secure payment for those furnishing labor
and materials in construction." Lizza, Mechanic's Lien Law
§ 3.2, at 3-2 (Mass. Cont. Legal Educ. 2001). This limitation of
"improvement" to a category associated with things being
constructed and to the construction industry is underscored by
the use in § 4 of the qualifier "other," which would appear to
cabin the word even further and limit the breadth it might
otherwise be deemed to have in the absence of that adjective.[14]

Thus, the word "improvement" in context must be seen as

---

[13]See Webster's Third New Intl. Dictionary 292 & 2267 (2002), defining
"building" as "a constructed edifice designed to stand more or less
permanently, covering a space of land, usu. covered by a roof and more or
less completely enclosed by walls, and serving as a dwelling, storehouse, fac-
tory, shelter for animals, or other useful structure — distinguished from
'structures' not designed for occupancy (as fences or monuments) and from
structures not intended for use in one place (as boats or trailers) even though
subject to occupancy"; and defining structure as "something constructed or
built . . . esp.: a building of imposing size: edifice." Similarly, the most com-
mon definitions of these terms appearing in our reports are taken from the
State Building Code, G. L. c. 143, § 1: "Building," a combination of any
materials, whether portable or fixed, having a roof, to form a structure for the
shelter of persons, animals or property . . . "Structure, a combination of
materials assembled at a fixed location to give support or shelter. . . ."

[14]The primary meanings of "other" in its adjectival form focus on the
relationship of the modified word to its antecedents: "1.a. Being the remain-
ing one of two or more . . . b. Being the remaining one of several." American
Heritage Dictionary of the English Language 1282 (3d ed. 1992). We recognize
that the term "improvement" is not qualified by the word "other" in G. L.
c. 254, § 1, but we have no occasion to address the significance, if any, of

denoting the product of some sort of construction-based activity on or at a property owner's land. That would not include the transportation functions Mammoet engaged in here — picking up, delivering, and setting down an already assembled unitary object (the transformer) that is never going to be used in situ — nor would it extend (as Mammoet argues) to any work or process that somehow "improve[s] the value of . . . [the owners's] property."[15]

In short, the statutory context in which the phrase "improvement of real property" is placed in § 4 strongly indicates that something is not an improvement unless it is itself, in whole or in part, constructed or assembled in connection with a building or structure or other construction-related project. Cf. *Milligan* v. *Tibbetts Engr. Corp.*, 391 Mass. 364, 367-368 (1984). At the very least, the placement of the phrase in that context militates against its interpretation in the expansive sense Mammoet advocates, which would afford mechanic's lien protection to the activity of anyone who simply moves a piece of the property owner's personal property from one location to another. Compare note 16, *infra*, and *Banushi* v. *Dorfman*, 438 Mass. at 244-245; *Santos* v. *Bettencourt*, 40 Mass. App. Ct. 90, 92-93 (1996); and *Osorno* v. *Simone*, 56 Mass. App. Ct. 612, 615-618 (2002) (all restricting the generality of the term "building" by reference to the specific words in a series under the doctrine of ejusdem generis).

Reinforcing this contextual limitation of the reach of the concept of "improvement" is the long-standing judicial observation that "[a] mechanic's lien is a statutory creation and can be

---

this difference between § 1 and § 4 (as well as § 2) in the instant circumstances, except to observe that it would be entirely consistent with the original purpose of the mechanic's lien law to afford enhanced protection to individual workers providing personal labor. See *Belding* v. *Cushing*, 1 Gray 576, 579-580 (1854).

[15]As the Supreme Judicial Court cogently observed (in the context of interpreting the term "improvement" for purposes of applying the statute of repose in G. L. c. 260, § 2B, discussed *infra*), "[I]f a piece of metal sculpture were welded to an exposed girder in a building, it certainly could be characterized as 'a permanent addition to or betterment of' the property, one 'enhanc[ing] its capital value' . . . [and] 'designed to make the property more . . . valuable' "; but [it] would [not establish that] "the sculptor had been involved in the protected *activity* of 'improvement to real property.' " (Emphasis in original.) *Dighton* v. *Federal Pacific Elec. Co.*, 399 Mass. 687, 697-698, cert. denied, 484 U.S. 953 (1987).

enforced only by strict compliance with . . . [G. L.] c. 254[, which] governs the creation, perfection, and dissolution of a mechanic's lien and 'is strictly construed against the party claiming the lien' " (citations omitted). *National Lumber Co.* v. *United Cas. & Sur. Ins. Co.*, 440 Mass. 723, 726 (2004), quoting from *Ng Bros. Constr.* v. *Cranney*, 436 Mass. 638, 644 (2002). See *Golden* v. *General Builders Supply LLC*, 441 Mass. 652, 654 (2004). Ignoring the rule of strict construction, Mammoet erroneously contends that "improvement" must be read as "intrinsically broad"[16] and should at least encompass anything that is so bulky as to be essentially "attached to the property" and practically "immovable."[17] These assertions are untenable,

---

[16]Mammoet makes an unsupported argument that the Legislature's extensive amendment of G. L. c. 254 in 1996 — which did expand the group of entities entitled to lien protection, the types of work for which a lien may be claimed, and the types of property subject to the lien, most pertinently by expanding the lien rights of those providing labor and materials beyond the previous limitation to a "building or structure" by adding the words "or other improvement of real property" — authorized "an expanded interpretation of the statute" which contradicts Entergy's "mistaken" reliance on "a theory of strict construction of the statute as a guiding principle." To the contrary, strict interpretation of the mechanic's lien statute remains the "guiding principle," as the recent *National Lumber* case demonstrates. *National Lumber Co.* v. *United Cas. & Sur. Ins. Co.*, 440 Mass. at 726. Even were we to accept Mammoet's repeated assertions that the 1996 amendments "dramatically" "expanded the protection of the lien" so that the statute should be given a "liberal" construction, it would do little to advance our effort to determine what the inclusion of the term "other improvement" was intended to cover. As a commentator on the 1996 revisions observed, "the [new] phrase 'other improvement,' taken to its logical extreme, arguably permits a neighborhood teenager to assert a mechanics' lien for such things as mowing a homeowner's lawn or painting a house provided he or she follows the new statute's procedural requirements. Similarly, a homeowner's oil delivery company, which provides an annual tank inspection, might conceivably be protected under the statute. The definitional scope of the term 'other improvement' is left unresolved by the new statute and remains to be interpreted by the courts." Alexander, Construction — Mechanics' Lien, 81 Mass. L. Rev. 167, 167 (1996).

[17]Mammoet's likening of the transformer to an immovable fixture is, of course, belied by its own actions in this case. Cf. *Nadien* v. *Bazata*, 303 Mass. 496, 499, (1939), noting that size alone does not make something a fixture (which is often defined as a "permanent improvement[] to real estate," *Worcester Redev. Authy.* v. *Massachusetts Dept. of Hous. & Community Dev.*, 47 Mass. App. Ct. 525, 529 [1999]), because, depending on the parties' intentions, "[a]rticles fully as ponderous, as firmly attached, and as difficult to remove [as the bowling alleys and ball racks involved in that case], and indeed complete buildings, may retain the character of pure chattels . . . ." *Nadien, supra* at 499.

as well as bereft of pertinent case support.[18]

Another applicable (and confirmatory) interpretive guide is the principle that legislative intent may be gleaned by construing the statutory term at issue in light of "the ordinary and approved usage of the language," as reflected in recognized dictionary definitions. See *Phillips* v. *Pembroke Real Estate, Inc.*, 443 Mass. 110, 114, 116-117 (2004). Webster's Third New Intl. Dictionary 1138 (2002) defines "improvement" as "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the [real] property more useful or valuable as distinguished from ordinary repairs." That definition decidedly cuts against Mammoet's position. The transformer delivered and set in place on a concrete pad apart from the power plant's generator is, notwithstanding its size, indisputably not permanent; there is no evidence in the record that it enhanced the "capital value" of Entergy's property[19]; and its intended service as a spare part — however expensive and weighty a spare part it may be — makes it conceptually more akin to a replacement light bulb, whose contingent use would commonly be regarded as an "ordinary repair" than as something that enhances real property or capital asset value.

Cases decided under G. L. c. 260, § 2B (a statute of repose which precludes any tort actions "arising out of any deficiency

---

[18]Mammoet's reiterated references to the purpose of the mechanic's lien statute generally — "to provide security to contractors, subcontractors, laborers, and suppliers for the value of their services and goods," *Tremont Tower Condominium, LLC* v. *George B.H. Macomber Co.*, 436 Mass. 677, 679 (2002), quoting from *Hammill-McCormick Assocs.* v. *New England Tel. & Tel. Co.*, 399 Mass. 541, 542-543 (1987) — is equally unavailing to its theory of "liberal construction." Although a statute's purpose is always a primary consideration in attempting to ascertain its framers' intent, see *Phillips* v. *Pembroke Real Estate, Inc.*, 443 Mass. 110, 114 (2004), the conceded purpose of G. L. c. 254 to afford security and benefit to such classes of persons does nothing to resolve the instant issue, since their efforts entitle them to lien protection only if those efforts are in fact rendered in connection with an improvement of the owner's real property. *Tremont Tower Condominium LLC, supra.*

[19]Cf. *George H. Sampson Co.* v. *Commonwealth*, 202 Mass. 326, 336 (1909) ("The use of tools and machines [there, the use of a pile driver in a construction project] which wear out in the use does not give a right to a [mechanic's] lien for their value as materials").

or neglect in the design, planning, construction or general administration of an improvement to real property" if brought over six years after the opening or substantial completion and occupation of the improvement) are instructive and appear in accord with our conclusion. They find authoritative guidance in the same dictionary definition of "improvement" noted above, see *Rosario* v. *M.D. Knowlton Co.*, 54 Mass. App. Ct. 796, 800 (2002), and stress as the key factors in identifying something as an "improvement of real property" (a) its permanence and (b) its actual effect in making the facility to which it is related more valuable or substantially more useful or productive. *Ibid.* (installation of a hydraulic lift for material handling in a facility). See *Milligan* v. *Tibbetts Engr. Corp.*, 391 Mass. at 364-366 (construction extending a road from a public way to facilities in an industrial park); *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 823 n.8 (1986) (foundation and mooring system for a ship permanently attached as the cocktail lounge of an adjacent restaurant); *Conley* v. *Scott Prods., Inc.*, 401 Mass. 645, 647 (1988) (installation of insulation in a building); *Parent* v. *Stone & Webster Engr. Corp.*, 408 Mass. 108, 111 (1990) (installation of permanent electrical distribution panel in an electrical generating plant); *Salinsky* v. *Perma-Home Corp.*, 15 Mass. App. Ct. 193, 198-199 (1983) (installation of aluminum siding).[20]

Mammoet's activity here could not be deemed an improvement under these authorities, because it neither made a permanent addition to Entergy's power plant — the transformer might be again moved to another location or sold, despite its

_____

[20]The process of examining the meaning given a word as used in one statute when interpreting the same term in a separate statute (on the premise that the same word should presumptively receive the same meaning barring some contrary indications in the respective statutes) is typically utilized when both pieces of legislation are in pari materia, i.e., relate to the same class of persons or things or share a common purpose. It is, nonetheless, permissible to do so, with discernment, even when the statutes are not so related or the terms are used in different legal contexts. See *First E. Bank, N.A.* v. *Jones*, 413 Mass. 654, 660-661 (1992); *Globe Newspaper Co.* v. *Beacon Hill Architectural Commn.*, 421 Mass. 570, 585-587 (1996); *Commonwealth* v. *Smith*, 431 Mass. 417, 420 (2000); *Commonwealth* v. *Welch*, 444 Mass. 80, 85-89 (2005); *Perlera* v. *Vining Disposal Serv., Inc.*, 47 Mass. App. Ct. 491, 493-496 (1999); *Police Dept. of Boston.* v. *Fedorchuk*, 48 Mass. App. Ct. 543, 548-549 (2000).

large size — nor effected anything that actually rendered the facility more useful and productive, either upon delivery or, indeed, ever, since the transformer might be sold or moved before being used, or never used at all.

Mammoet has pointed to no supporting or persuasive authority for its claim of entitlement to a mechanic's lien on these facts. Compare, in particular, *Colomba* v. *Fulchini Plumbing*, 58 Mass. App. Ct. 901, 902 (2003) ("mere installation" of a "replacement boiler" was not an "improvement to real property" under G. L. c. 260, § 2B). Its effort to liken its position to that of the materials suppliers in *International Heating & Air Conditioning Corp.* v. *Rich Constr. Co.* 372 Mass. 134 (1977), and *M. Lasden, Inc.* v. *Decker Elec. Corp.*, 372 Mass. 179 (1977), is misplaced and unconvincing. Mammoet is not a materials supplier, and neither of those cases dealt in any way with the instant issue (the meaning and scope of the words "improvement of real property"). Both in fact involved a surety bond statute, G. L. c. 149, § 29, that — unlike the mechanic's lien statute — is accepted as remedial and given a broad and liberal construction. See *International Heating & Air Conditioning Corp.*, *supra* at 138; *M. Lasden, Inc.*, *supra* at 182-183.[21]

Mammoet's reliance on a dozen cases dealing with mechanic's lien statutes in several other jurisdictions is also unavailing. Every one of those cases involved lien claimants who actually delivered building materials or equipment to a construction site — i.e., delivered property the suppliers were not merely providing but selling — that was intended to be used in the ongoing construction but was never actually so used. In addition to the distinction between the factual circumstances of those cases and this, Mammoet never establishes the identity, or even the

---

[21]Indeed, the court in *International Heating & Air Conditioning Corp.*, 372 Mass. at 138, explicitly observed that the mechanic's lien statute is to be construed strictly and that the outcome of the case would be different were the payment bond statute similarly interpreted. Moreover, in *M. Lasden, Inc.*, 372 Mass. at 184-185 & n.5, the court noted in dicta that, while under some other State statutes regulating mechanics' liens, delivery to a building of materials being sold with the intention that they would be incorporated into a construction project is sufficient to sustain a lien even if the materials are never actually so used, Massachusetts has never so held. Mammoet, of course, was not involved in selling any "materials" that were intended to be so incorporated.

similarity, of the mechanic's lien statutes in those other jurisdictions.[22,23]

Mammoet's final contentions are that (a) it "furnished" "tools" or "materials," in the form of its own equipment used to move and rough-set the transformer, and (b) what it did amounted to the "alteration" of an "improvement of real property." These arguments are, however, merely conclusory and unsupported by coherent reasoning, contrary to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). They are,

[22]"Although virtually every state has a mechanic's lien law, there is little uniformity and a wide variation as to the substantive and procedural aspects of the statutes. Even simply considering the New England states, the disparity in mechanic's lien statutes is astounding . . . . [N]othing that one learns from the Massachusetts Mechanic's Lien Law will be of much use in other states . . . ." Lizza, *supra*, § 3.3, at 3-4. Nowhere in its discussion of cases from other jurisdictions does Mammoet set forth the various statutory provisions on which these cases are based.

[23]For its part, Entergy relies on two mechanic's lien cases under earlier forms of the statute — *Webster* v. *Real Estate Improvement Co.*, 140 Mass. 526 (1886), and *Thomas* v. *Commonwealth*, 215 Mass. 369 (1913) — which stand for the proposition that merely transporting materials to a construction site is insufficient to support a mechanic's lien. Mammoet correctly points out that the statutes applicable to those cases spoke only in terms of labor or materials in connection with a "building" or "structure" and not with "other improvement of real property." The rationale of those cases, however, does appear pertinent to the instant case: "The petitioner does not allege that he performed any labor upon material which became part of the structure, so as to change its shape or character, in order to adapt it to the building. He did nothing with the sand, to make it fit and proper to enter into the construction of any part of the house, nor did he perform any labor by which the lumber was fitted and adapted to any section of the structure. What he did was to draw the sand to these premises, so that the contractor, if he saw fit, with other material could make it into mortar, and use it in the construction of the building. So with the lumber; when delivered, the contractor could do with it as he pleased. He could sell it, as his assignee in insolvency afterwards did as to a part of it, or he could use the sand in making mortar, and then sell it, as was done by his assignee as to a portion thereof; or he could employ them in the erection of the house. We think this labor of the petitioner does not come within the terms of the statute; that it was not connected with the building of the structure; and that it was too remote to enable him to establish a mechanic's lien therefor." *Webster v. Real Estate Improvement Co.*, 140 Mass. at 527. The Legislature, presumed to be aware of these rulings when it amended the statute on several occasions, particularly in 1996, could of course have explicitly included transportation or delivery services as lien-entitling had it intended to do so. See *MacQuarrie* v. *Balch*, 362 Mass. 151, 152 (1972); *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 238-239 (2001).

therefore, unworthy of extended discussion. See *Cameron* v. *Carelli*, 39 Mass. App. Ct. 81, 85-86 (1995), and cases cited. We note that "material" under the statute is traditionally held to refer to building materials sold by materialmen or suppliers with the understanding or expectation they would be incorporated or used in a construction project, cf. note 19, *supra*, and *International Heating & Air Conditioning Corp.* v. *Rich Constr. Co.*, 372 Mass. at 136-137; *M. Lasden, Inc.* v. *Decker Elec. Corp.*, 372 Mass. at 182-184; while "tools" are typically manual devices ordinarily used by workmen and mechanics, *Devney's Case*, 223 Mass. 270, 272 (1916), such "as a hammer or saw." Webster's Third New Intl. Dictionary 2408.

Mammoet's contention begs the question in any event, since the lien depends upon the furnished objects being related to an "improvement of real property." The "improvement" to which Mammoet directs these assertions is, however, nothing more than the preexisting concrete storage pad at Entergy's facility. Mammoet makes no factual or legal argument demonstrating that that pad is or ever was an "improvement" under the statute, there being nothing in the record indicating when or by whom the pad was created or whether it was either permanent or an enhancement of the capital value of the property. Moreover, the work that Mammoet did — piling something on top of the pad — was not an "alteration" as that term is commonly used.[24]

Although we conclude that Mammoet is not entitled to the protection of the mechanic's lien statute, we are not unmindful

---

[24]Webster's Third New Intl. Dictionary 63 defines "alteration" as "a change or modification made on a building that does not increase its exterior dimensions"; while in Black's Law Dictionary an "alteration" is a "substantial change to real estate, esp. to a structure, usu[ally] not involving an addition to or removal of the exterior dimensions of a building's structural parts." Black's Law Dictionary 85 (8th ed. 2004). Under neither of these definitions did Mammoet's work — the setting down of the transformer onto the concrete pad — "alter" or change the pad itself for purposes of the statute. It merely constituted the placing of a chattel, an inoperable, single piece of equipment — albeit an extremely large and difficult-to-move one — on top of the pad. Further, when considered in connection with the other types of work listed in the statute, i.e., "erection," "repair," "removal" (see *Commonwealth* v. *Baker*, 368 Mass. 58, 68 [1975], and the discussion, *supra*), no "alteration" of the pad was involved in that work; merely moving the transformer from point A to point B was not the sort of construction-related project connoted by the other terms.

of the difficulty and expertise involved in the work it performed and that such work was indeed of value to Entergy. Nonetheless, the factual realities are that Entergy has already paid in full for that work and was in no way responsible for Mammoet's being deprived of its rightful payment as a result of the bankruptcy of others; and the legal realities are that the mechanic's lien statute remains subject to strict construction — "[t]here are no equities to be invoked in aid of it." *International Heating & Air Conditioning Corp.* v. *Rich Constr. Co.*, 372 Mass. at 138, quoting from *Gale* v. *Blaikie*, 129 Mass. 206, 209 (1880). If a transporter or a deliverer of a piece of equipment or other chattel not intended to be utilized in or as part of a construction project is to receive the statute's protection, it is up to the Legislature to make it so. Cf. *National Lumber Co.* v. *United Cas. & Sur. Ins. Co.*, 440 Mass. at 727-728.

*Judgment affirmed.*