NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

21-P-985                                      Appeals Court

     MICHAEL BRUNO & another[1]  vs.  ALLIANCE RENTAL GROUP, LLC.


                        No. 21-P-985.

     Middlesex.     September 12, 2022. – August 29, 2023.

            Present:  Desmond, Sacks, & D'Angelo, JJ.


Mechanic's Lien.  Statute, Construction.  Consumer Protection
     Act, Unfair act or practice, Damages, Attorney's fees.
     Damages, Consumer protection case, Attorney's fees.  Words,
     "Improvement of real property," "To become due."


     Civil action commenced in the Superior Court Department on
May 23, 2019.

     The case was heard by Douglas H. Wilkins, J.


     David H. Travers (Mikaela A. Rice also present) for the
defendant.
     Joshua M. Looney for Michael Bruno.
     Christian W. Habersaat for Great Midwest Insurance Company.


     D'ANGELO, J.  This dispute arises from the rental of heavy

machinery from a subcontractor, Alliance Rental Group, LLC

(Alliance), to a contractor, Ivester Construction Corp.

_____

     [1] Great Midwest Insurance Company, as surety to the lien
bonds executed by Michael Bruno.

(Ivester), working on property in North Reading (property) owned by Michael Bruno.  Ivester failed to pay Alliance any of the rental fees.  Alliance filed two mechanic's liens on the property, seeking $697,479.06.  See G. L. c. 254, § 4. Following a bench trial, a Superior Court judge awarded Alliance $180,000 for the reasonable rental value of the equipment and awarded Bruno $100,182 for Alliance's violation of G. L. c. 93A.

In this appeal we consider, among other things, whether G. L. c. 254, § 4, gives a judge the authority to reduce a lien amount for periods where a subcontractor's rental equipment is on the work site, but not being used for extended periods of time.  We conclude that it does not.  Accordingly, we amend in part and affirm in part the judgment entered in the Superior Court.

Background.  We take our facts from the findings of fact of the trial judge and the uncontroverted facts set forth in the exhibits.

1.  The contracts.  On March 27, 2013, Bruno and Ivester entered into a subdivision contract (original contract) for Ivester to perform subdivision improvements on the property (project).[2]  In exchange, Bruno agreed to pay Ivester $300,000

_____

[2] The original contract covered work on a road in the subdivision and "Lots 1 through 11" located at 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, and 19 Charles Street.

pursuant to a distribution schedule, and to transfer lots 6 and 7 to Ivester upon completion of the work under the original contract. To complete the work, Ivester entered into rental agreements with Alliance for the use of an excavator and loader. The rental rate for each machine was $6,000 per month, plus 6.25% sales tax and any repair costs. There was no end date specified in the rental agreements. The rental agreement for the excavator had a "start date" of January 1, 2015, and the start date of the rental agreement for the loader began one year later, on January 1, 2016. The equipment was last used to perform work under the original contract on October 4, 2018, although the excavator remained on the property until March 18, 2019, and the loader remained on the property until May 18, 2019. From the start of the rental agreements through those dates, Ivester did not pay any money to Alliance for the rentals. The amount Alliance had invoiced Ivester for the loader was $311,287.91 -- the total of $261,935 in rental charges and $49,352.91 in repair charges. The invoice amount for the excavator was $386,191.15 -- the total of $323,820 in rental charges and $62,371.15 in repair charges. In total, the invoices stated a balance of $697,479.06 owed by Ivester to Alliance.

2. <u>Delays in use of the equipment</u>. There were various periods of "down time" during the project in which construction

was paused and the equipment was not used, "including a one-year period waiting for a street permit, a one-year period waiting for an electrical permit and a period waiting for broken drains to be fixed."  Additionally, section 350-23-B of the North Reading subdivision regulations prohibited subdivision construction between December 1 and March 15 of each year.  Both pieces of equipment were also removed from the property in order to complete repairs -- the excavator twice and the loader once.  Although required by the rental agreements between Ivester and Alliance, Ivester did not maintain daily logs to track the use of the equipment during the construction, so there was no documentary evidence of how and when the equipment was used.  The judge determined, based on industry practice, the parties' expectations and estimates, and the amount of down time, that the equipment was furnished for improvements "for a total period of one and one quarter years each," i.e., fifteen months each.  The trial judge concluded that "[g]iven the inevitability of some degree of 'down time' on any project, it is likely that this estimate includes short periods of inactivity during which it would not be practical to return and re-lease the equipment."

    3.  <u>Relationship between Alliance's and Ivester's principals</u>.  Kevin Matthews was the sole manager and member of

Alliance. Matthews had known Kenneth Ivester,[3] the owner and principal of Ivester, for about fifteen years prior to trial. Prior to entering into the rental agreements, Matthews had made two personal loans to Kenneth, the first for $150,000, and the second for $250,000. These loans were based on Matthews's understanding that Ivester "would get two lots at the completion of the [p]roject" and were funded using Matthews's personal home equity line of credit.

4. Procedural history. To begin the process of establishing mechanic's liens, Alliance recorded four notices of contract. The first two, recorded on January 31, 2019, and March 1, 2019, were eventually dissolved by a Superior Court judge as untimely and incomplete, and they are not at issue in this appeal. The subsequent two notices of contract were recorded on March 27, 2019, regarding the excavator, and on May 3, 2019, regarding the loader, and corresponding statements of account were recorded within the time required by G. L. c. 254, § 8. On May 23, 2019, Bruno brought this action against Alliance pursuant to G. L. c. 254, § 15A, for summary discharge of the mechanic's liens. On August 10, 2020, Bruno amended his

---

[3] We hereafter refer to Kenneth by his first name to avoid confusion.

complaint to add a count for violation of G. L. c. 93A.[4]
Alliance filed a counterclaim to enforce its mechanic's lien
rights. The case proceeded to a bench trial on March 16 and 17,
2021, where the judge ultimately concluded Alliance was owed a
total of $180,000 on the two liens, not the $697,479.06 that
Alliance claimed. The judge based this amount on the fair
market value of the actual use of each piece of equipment, i.e.,
$6,000 per month for fifteen months each. The judge also found
for Bruno on his c. 93A claim, and on August 6, 2021, he awarded
Bruno $100,182 in c. 93A damages, comprised of Bruno's
attorney's fees and expenses in defending against what the judge
found was "a scheme by Alliance, Matthews and Ivester to extract
money from Bruno [through the mechanic's lien process] well
beyond any commercially justifiable amount." This brought
Alliance's net recovery to $79,818. Both parties appealed.[5]

Discussion. "In reviewing a matter wherein the trial judge
was the finder or fact, [t]he findings of fact . . . are
accepted unless they are clearly erroneous[] [and] [w]e review
the judge's legal conclusions de novo" (quotation and citation

---

[4] Bruno also amended the complaint to add a count alleging abuse of process, but he waived that claim at trial.

[5] After oral argument, this court issued a memorandum and order remanding the case to the judge to make additional findings of fact. See Bruno v. Alliance Rental Group, LLC, 101 Mass. App. Ct. 1124 (2022). The judge made the requested findings.

omitted). Allen v. Allen, 86 Mass. App. Ct. 295, 298 (2014). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 789 (1996), quoting Freyermuth v. Lutfy, 376 Mass. 612, 615 (1978).

Both parties contest the amount of $180,000 that the judge awarded to Alliance on its counterclaim to enforce the liens. Alliance argues that it should be awarded the full $697,479.06 owed on the statements of account, while Bruno argues Alliance should not be awarded any amount of money because the liens are invalid. In considering these arguments we must address two issues: first, whether G. L. c. 254, § 4, authorizes a judge to reduce a lien amount for periods where a subcontractor's rental equipment is on the work site but not being used for extended periods of time; and second, whether the liens are valid. We must also address whether the judge properly concluded that Alliance violated G. L. c. 93A.

1. Reduction of the lien amount. a. Use of the rental equipment. The trial judge reduced the amount of Alliance's liens from $697,479.06 to $180,000 to reflect the amount of time that he determined Alliance's rental equipment was furnished for use for work on Ivester's original contract with Bruno. Under

G. L. c. 254, § 4, a person (here, Alliance) who "under a written contract with a contractor" "furnishes rental equipment . . . in the . . . improvement of real property" may record a notice of contract and obtain a lien on the real property being improved (i.e., the "real property . . . owned by the party who entered into the original contract," here, Bruno) to secure payment for the rental equipment.  See generally Graycor Constr. Co. v. Pacific Theatres Exhibition Corp., 490 Mass. 636, 640-642 (2022).

Alliance argues that it furnished rental equipment to the project for the entire duration of the time the rental agreements until the equipment was removed from the site,  i.e., from January 1, 2015, until March 18, 2019, for the excavator, and from January 1, 2016, to May 18, 2019, for the loader. Bruno argues that Alliance furnished rental equipment only for those periods of time that the equipment was used to perform work on the project, and that Alliance last furnished rental equipment to the project on October 4, 2018, the date that the equipment was last used to perform work on the project.

Several States have statutes that specifically limit mechanic's liens for rental equipment to periods of actual use. See, e.g., Haw. Rev. Stat. § 507-41; N.D. Cent. Code § 35-27-01(4); S.C. Code Ann. § 29-5-10(a).  See also, e.g., Iowa Code § 572.2(2) (lien may cover reasonable periods of nonuse if taken

into account in rental agreement); Mont. Code Ann. § 71-3-524(3)(a) (same); Neb. Rev. Stat. § 52-134(3)(a) (same); Ohio Rev. Code Ann. § 1311.12(C)(1) (same); Tenn. Code Ann. § 66-11-102(g)(1) (same).  However, where the Massachusetts Legislature has not included such limiting language in G. L. c. 254, § 2, we should not read it into the statute.  "A mechanic's lien is not a common-law right but a creature of statute, which 'compels strict compliance in order to obtain relief.'"  National Lumber Co. v. Lombardi, 64 Mass. App. Ct. 490, 492-493 (2005), quoting Mullen Lumber Co. v. Lore, 404 Mass. 750, 752 (1989).

Bruno urges us to interpret the statute to mean that equipment is only "furnishe[d] . . . in the . . . improvement of real property," G. L. c. 254, § 4, during periods of actual use, thus limiting mechanic's liens to that time -- or at least that equipment is not so furnished during extended periods of nonuse. Bruno primarily relies on two cases to support this argument: Mammoet USA, Inc. v. Entergy Nuclear Generation Co., 64 Mass. App. Ct. 37 (2005), and John Marini Mgt. Co. v. Butler, 70 Mass. App. Ct. 142 (2007).  However, there are important distinctions between those cases and the case at hand.

In Mammoet, 64 Mass. App. Ct. at 37, the issue before the court was whether a subcontractor's transportation and delivery of a backup transformer, which was stored on the property only for possible future use and was never actually used, constituted

an "improvement of real property" pursuant to G. L. c. 254, § 4. The court concluded that it did not, reasoning that "something is not an improvement unless it is itself, in whole or in part, constructed or assembled in connection with a building or structure or other construction-related project." Id. at 43. A backup transformer was never meant to be and was never used in connection with the actual construction at hand. The court noted that the transportation and storage of the backup transformer was also not an improvement because it

> "neither made a permanent addition to [the defendant]'s power plant -- the transformer might be again moved to another location or sold, despite its large size -- nor effected anything that actually rendered the facility more useful or productive, either upon delivery or, indeed, ever, since the transformer might be sold or moved before being used, or never used at all."

Id. at 46-47.

Here, unlike the backup transformer in Mammoet, the excavator and loader were intended to be, and were in fact, used for the "improvement of real property." Although daily usage logs were not kept, the judge found that out of the total time the equipment was on site (more than four years for the excavator and more than three years for the loader), "Alliance furnished the [e]xcavator and [l]oader for the improvements for a total period of one and one[-]quarter years each" based on testimony about typical industry practice for the duration of this type of project, as well as evidence of the equipment's

down time.  The judge concluded that although some projects may inevitably include "down time," i.e., "short periods of inactivity during which it would not be practical to return and re-lease the equipment," what happened here crossed a line.  The judge reasoned that, "by analogy to Mammoet, long-term storage of equipment does not qualify as 'furnish[ing]' equipment, even if the equipment is stored on the project site."  Although this reasoning has some appeal, the statute does not tell us how much storage is "long-term" storage.  The statute does not authorize judges to draw lines between periods of nonuse that are reasonable and those that exceed market norms to such a degree that the corresponding costs become unrecoverable through a mechanic's lien.  If the Legislature wishes to adopt such a provision, the other State statutes that we have cited supra provide models for doing so.

The judge also found that "Ivester used both the [l]oader and [e]xcavator to perform [its] obligations under the contract with Bruno."  Since the equipment was intended to be, and in fact was, used for the improvement of real property, Mammoet does not provide justification to reduce the amount of a lien amount based on periods of nonuse.  We conclude that there is no provision in G. L. c. 254, § 4, that allows a judge to reduce the amount of a mechanic's lien from the amount due under an undisputed contract.  See Commonwealth v. Brooks, 366 Mass. 423,

427-428 (1974) ("statutes must be construed as written and cannot be rewritten judicially"); Dalli v. Board of Educ., 358 Mass. 753, 759 (1971) ("We have traditionally and consistently declined to trespass on legislative territory in deference to the time tested wisdom of the separation of powers . . . even when it appeared that a highly desirable and just result might thus be achieved"); King v. Viscoloid Co., 219 Mass. 420, 425 (1914) (we do not "read into the statute a provision which the Legislature did not see fit to put there, whether the omission came from inadvertence or of set purpose"); Larkin v. Charlestown Sav. Bank, 7 Mass. App. Ct. 178, 183-184 (1979) ("As we read the statute, its terms leave no room for the addition of such language, and any desired change in the statutory language would be for the Legislature to make in the first instance, not a court" [footnote omitted]).

Likewise, this court's decision in John Marini Mgt. Co. does not support Bruno's argument. There the court concluded that the lien "is intended to protect the value of the use of such equipment during the process of construction. Typically, that value is the fair rental value of the equipment for the time it is used in the construction process." John Marini Mgt. Co., 70 Mass. App. Ct. at 152. Bruno argues that the amount of the liens, therefore, should be the fair market value of the use, which would reduce Alliance's liens for the time the

equipment was not actively being used for the project.  However, the court in that case did not reduce the lien amount to "the fair rental value of the equipment for the time it [was] used," but instead merely excluded from the recoverable lien amount any compensation for damage to equipment or for equipment that was not returned.  Id.  To reduce the recoverable amount here to the fair rental value for the period of actual use would be a large expansion of the existing law without legislative authority, which we decline to do.  Additionally, the court's use of the word "[t]ypically" to describe a lien's value as the fair market value of actual use indicates that the court did not intend the reduction of a mechanic's lien for periods of nonuse to be a legal rule.  Id.

Accordingly, we agree with Alliance that the judge erred in reducing the amount of the liens for periods of nonuse.

b.  Repair of the rental equipment.  Bruno also argues that the cost of repairs cannot be included in the lien amount under G. L. c. 254, § 4.  With this, we agree.[6]  The mechanic's lien statute "contains no suggestion that mechanic's liens are intended to cover . . . negligently inflicted damage" or "the

---

[6] The judge agreed as well, but because of his manner of calculating the amount Alliance would recover based on market values, he did not find it necessary to reduce that recovery to exclude repair costs.  Because we have concluded that the judge's manner of calculation was in error, we must now separately account for the unrecoverable repair costs.

value of [rental] property which was damaged or not returned."
John Marini Mgt. Co., 70 Mass. App. Ct. at 152-153. "[T]he lien
does not cover the total value of the rental equipment . . .
furnished where, under the contract, the equipment is intended
to be returned to the subcontractor to be used in other
projects. Rather, the lien is intended to protect the value of
the use of such equipment during the process of construction."
Id. at 152. Although the issue now before us was not directly
addressed in John Marini Mgt. Co., we think, based on the
parties' limited briefing of the issue, that the principles of
that decision apply to repair costs incurred by the equipment
lessor (Alliance) and charged to the lessee (Ivester).

Here, the excavator and loader were damaged during
construction, presumably by Ivester, and required repairs by
Alliance. During at least some of these repairs, the equipment
was transported off site to a facility in Foxborough. The
excavator underwent eight repairs totaling $62,371.15, and the
loader underwent nine repairs totaling $49,602.91. In total,
the cost of repairs to Ivester for both pieces of equipment was
$111,974.06.

Because G. L. c. 254 does not permit recovery of the repair costs of the rental equipment, $111,974.06 shall be excluded from the total judgment awarded to Alliance.[7]

2. <u>Validity of liens</u>. Bruno argues that there are three reasons Alliance's liens are invalid:  (1) the notices of contract were not timely filed, see G. L. c. 254, § 4; (2) Alliance willfully and knowingly claimed amounts more than what was due, see G. L. c. 254, § 11; and (3) there was no amount due or to become due from Bruno to Ivester under the original contract at the time Alliance's notices of contract were filed and Bruno had actual notice of them, see G. L. c. 254, § 4.  We address each in turn and conclude that none is persuasive.

a. <u>Timeliness</u>.  Bruno first argues that the judge erred in finding that Alliance's notices of contract were timely filed. General Laws c. 254, § 4, provides, as relevant here, that a subcontractor (Alliance) is required to file a notice of contract within "ninety days after the last day a person entitled to enforce a lien under section two or anyone claiming by, through or under him . . . furnished rental equipment."  The date from which the ninety days began to run is at issue here

---

[7] Bruno has not requested that the liens be reduced to account for the time the equipment was off site for repairs, so we need not consider that issue in this case.  This is not to say, however, that a lien may not be reduced by the amount of time equipment is offsite being repaired in future cases.

and depends on when the equipment was last furnished for Ivester's work under the original contract. Bruno argues that October 4, 2018, is the date from which ninety days should be measured because that is the last day Alliance's equipment was used for work on the project.[8] Under this theory, Alliance's filings on March 27, 2019, and May 3, 2019, were more than ninety days after October 4, 2018, and thus the filings were untimely.

Bruno's argument presents questions of law and fact. As to the legal question, Bruno argues that the equipment cannot be considered to have been "furnished" during periods when it was not actually being used, an argument that we have rejected for the reasons stated above. As to the factual question, the issue is whether the rental equipment was last "furnished" for use under the original contract no more than ninety days before Alliance's filings.

The trial judge determined that the filings were made within ninety days of when Alliance last furnished the rental equipment for such use because "in the absence of any contrary directive from Bruno, Ivester continued to have the obligation to provide services on the original contract as of March 15-18,

---

[8] Kenneth testified that he believed that the excavator was used on the project in March and May of 2019, but the judge found that this work was not within the scope of the original contract.

2019," under section 2.1 of the original contract.[9] Under section 2.1, Ivester was required "to furnish sufficient administration and superintendence of the [w]ork and use best efforts to furnish at all times an adequate supply of workmen and materials, and to perform the [w]ork in the best and soundest way in the most expeditious manner consistent with good construction and trade practices." The judge found that Ivester could not "reasonably or safely predict" that it could comply with its obligations under section 2.1 without the rental equipment being available. That, coupled with the fact that Bruno did not notify Ivester "in a reasonable way" that its obligations were relieved or seriously look for a replacement contractor until February or March 2021, made it reasonable for Ivester to keep the equipment on the site in case there was further work to be done. The judge found that Alliance and Ivester determined by March 18, 2019, that the "[e]quipment was not needed on the [p]roject in the near term and could be removed without jeopardizing Ivester's compliance with [s]ection 2.1."

Based on the evidence as a whole, we are not "left with the definite and firm conviction that a mistake has been committed"

---

[9] March 16 was the date that construction work could resume each year under section 350-23-B of the North Reading subdivision regulations.

(citation omitted), Herson, 40 Mass. App. Ct. at 789, and conclude that the judge's finding that Alliance last furnished the rental equipment for the improvement of the property on March 18, 2019, was not clearly erroneous, and thus, the notices of contract were timely filed by Alliance.

b. Willfully and knowingly. Under G. L. c. 254, § 11, "[t]he validity of the lien shall not be affected . . . by an inaccuracy in stating the amount due for labor or material . . . unless it is shown that the person filing the [lien] has wilfully and knowingly claimed more than is due him." Bruno argues the liens are invalid because Alliance willfully and knowingly claimed an inflated amount.

The judge's finding that Alliance did not knowingly claim more than was due was not clearly erroneous. For the liens to be invalid, Alliance must have "knowingly" sought or "had knowledge" that it was seeking to recover amounts that were not due to it. See Still v. Commissioner of Dep't of Employment & Training, 39 Mass. App. Ct. 502, 510 (1995), S.C., 423 Mass. 805 (1996) (discussing "dictionary definitions and decisional precedent" that accord "knowing" "basic intentional, cognitive content"). As the trial judge found, given that judicial guidance on G. L. c. 254 is scarce, Alliance reasonably could have believed that under c. 254 it was due "the monthly rental for the entire period when the equipment was at the site, even

if idle -- even if the result exceeded market rents."  Alliance did not know that the judge would ultimately conclude that c. 254 limited the amount due Alliance on its liens to market rents (a conclusion that we have now determined was erroneous in any event).  This is the case regardless of whether, viewed under G. L. c. 93A, Alliance and Ivester were operating a scheme against Bruno to "run up" the rental charges, as discussed infra.  See Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975) (G. L. c. 93A liability can be found regardless of whether underlying conduct is unlawful).  This is also the case even if repair costs cannot be included in the value of the lien, as discussed supra, for the same reason -- there has been limited judicial guidance on whether equipment repair costs were recoverable and "due" under G. L. c. 254.

c.  Amount due or to become due.  Lastly, Bruno argues that there was no amount due or to become due under the original contract, thus invalidating Alliance's liens.  General Laws c. 254, § 4, limits the amount of a subcontractor's lien to "the amount due or to become due under the original contract as of the date notice of the filing of the subcontract [was] given by the subcontractor to the owner."

Bruno argues there is no evidence of the date that Alliance gave him actual notice that it filed the notices of contract, as required by G. L. c. 254, § 4, and thus no date as of which to

determine whether an amount was due or to become due. While we acknowledge the mechanic's lien statute requires strict compliance, see Hammill-McCormick Assocs., Inc. v. New England Tel. & Tel. Co., 399 Mass. 541, 543-544 (1987), the judge found that Bruno had actual notice of the contract filings before May 23, 2019, when he filed this action to discharge the liens.

We must consider the threshold question whether there was an amount due or to become due to Ivester under the original contract. "The statute is strictly construed against the party claiming the lien, and that includes establishing that money is due or to become due." Superior Mechanical Plumbing & Heating, Inc. v. Insurance Co. of the West, 81 Mass. App. Ct. 584, 588 (2012). The original contract obligated Bruno to pay Ivester $300,000 pursuant to a distribution schedule and to transfer to Ivester lots 6 and 7 upon completion of the project. By March 27, 2019, when the liens were filed, Bruno had already paid Ivester $300,000. However, Bruno had not transferred lots 6 and 7 to Ivester. The issue is whether those lots were still due to Ivester when Bruno received notice of the liens.

Bruno urges us to conclude there was no amount "to become due," citing BloomSouth Flooring Corp. v. Boys' & Girls' Club of Taunton Inc., 440 Mass. 618 (2003), and Superior Mechanical Plumbing & Heating, Inc., 81 Mass. App. Ct. at 589. However, these cases are inapposite. In BloomSouth Flooring Corp., the

contractor abandoned the job before substantial completion. As a result, the owner terminated the contract, and the contractor was not entitled to final payment under the original contract, meaning the plaintiff subcontractors could not recover on their liens. See BloomSouth Flooring Corp., supra at 619-620, 624.

Here, the judge found that Bruno's search for a new contractor had only just begun by the time of trial and that, prior to that point, his actions reflected an expectation that Ivester would continue as the contractor. The judge found that

> "Ivester had an amount to become due under the [original c]ontract, namely the two lots that [it] would receive upon [p]roject completion. There was a reasonable expectation at the time that Ivester would complete the [p]roject, as evidenced by the absence of any effort to terminate the [original] [c]ontract or to terminate Ivester and the fact that, nearly two years later, Bruno's search for a contractor to replace Ivester's role on the [p]roject had just commenced" (footnote omitted).

These findings distinguish this case from BloomSouth Flooring Corp. because Bruno did not terminate Ivester and there was a reasonable expectation, at the time Alliance filed its notices of contract, that Ivester would complete the original contract and receive the valuable lots that were "due."

While it is true that formal termination is not the only factor used to determine whether an owner owes additional payments to a contractor, see Maverick Constr. Mgt. Servs., Inc. v. Fidelity & Deposit Co. of Md., 80 Mass. App. Ct. 264, 269-270 (2011), Bruno's argument is not supported by Superior Mechanical

Plumbing & Heating, Inc., 81 Mass. App. Ct. at 585-586, either, where the notice of contract was filed before the contract was terminated. In that case, the contractor committed a material breach of the contract by not timely paying the subcontractors -- a requirement that was emphasized in multiple provisions of the contract, making it "abundantly clear that [the contractor]'s failure to pay its subcontractors . . . relieved [the owner] of its obligation to make any further payments" and as a result there was no amount due or to become due. Id. at 590.

Here, the trial judge found that "while Ivester certainly failed in many respects, Bruno himself was responsible for many delays and, if he intended to relieve Ivester from the obligation to be ready when called upon, did not act in a reasonable way to relieve Ivester of the obligation to act in the 'most expeditious manner consistent with good construction and trade practices.'" The judge did not find that Ivester committed a material breach of the contract and in fact placed responsibility of the delays on Bruno as well. Bruno did not relieve Ivester of its responsibilities, and Ivester continued to keep the equipment on the work site, which the trial judge said was "a reasonable way to comply with Section 2.1 of the original contract as long as future work was reasonably likely to be needed in the near term." Because the trial judge in this

case found that Ivester was still prepared to complete the work, and Ivester did not have any additional material breaches of the contract, the reasoning in Superior Mechanical Plumbing & Heating, Inc., does not apply to this case.[10]

Therefore, as of May 23, 2019, when Bruno filed suit to discharge the liens at issue (and therefore must have had notice of them), lots 6 and 7 were "to become due" to Ivester. Bruno and his real estate broker testified at trial that lots 4, 5, and 6 were sold for $450,000 each. This amount is confirmed in the trial judge's findings. The judge found that the value of lots 6 and 7 together was $900,000, which exceeded the amounts Alliance claimed under the liens.

3. Chapter 93A. General Laws c. 93A, § 2 (a), prohibits "unfair or deceptive acts or practices." When considering a c. 93A claim, "[a]lthough whether a particular set of acts, in

---

[10] Bruno also contends that Ivester failed to meet a condition precedent of the original contract by not completing the work, that his obligation to pay Ivester therefore did not arise, and that there is no amount due or to become due for this reason. This argument is unavailing, because almost every construction contract requires the work to be completed before full payment is required. Were we to invalidate any lien where the work had not been completed, this would significantly diminish the usefulness of the mechanic's lien statute, which has as its primary purpose "to provide security to contractors, subcontractors, laborers, and suppliers for the value of their services and goods provided for improving the owner's real estate." NES Rentals v. Maine Drilling & Blasting, Inc., 465 Mass. 856, 860 (2013), quoting Hammill-McCormick Assocs., Inc., 399 Mass. at 542-543.

their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law" (citation omitted). Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008). Factual findings underpinning a c. 93A claim are reviewed for clear error. See Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 171 (2013).

To determine if a practice is unfair, we consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)" (citation omitted). PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). That conduct is not independently unlawful is not a defense to a G. L. c. 93A claim, as the statute "created new substantive rights by making conduct unlawful which was not unlawful under the common law or any prior statute" (citation omitted). Slaney, 366 Mass. at 693.

The trial judge determined that Matthews and Ivester had devised and executed a "scheme . . . to extract money[] from Bruno well beyond any commercially justifiable amount." The judge's conclusion was based on his findings that

"Alliance and [Kenneth] had a pre-existing personal relationship. [Kenneth] owed Alliance's principal, Matthews, hundreds of thousands of dollars, which they both knew [Kenneth] almost certainly could not repay except with funds from Bruno in connection with Ivester's work on the project. Ivester and Alliance entered into open-ended equipment rentals, lacking any end date. They then allowed monthly charges to accrue well beyond what they knew were Ivester's ability to pay, well beyond the expected period of equipment use for the project. Alliance made no efforts to secure return of the equipment. Ivester failed to keep contractually required activity logs, which prompted no action by Matthews to enforce that requirement. Then Alliance filed notices of contract for amounts grossly in excess of market rentals and, indeed, more than twice the entire purchase price of the equipment. It made no effort to deduct charges for time when the equipment was idle, furnishing nothing to the improvements at issue."

Alliance contends that the judge's conclusion was unsupported by the evidence. We disagree.

Other findings further support the judge's conclusion that there was a scheme, including that the leases "had no termination date and no maximum rental amount," that Alliance had knowledge that the equipment was sitting idle for long periods of time, and that Ivester declined to purchase the equipment because the price was too high, which showed "Alliance never reasonably expected [Ivester] to pay amounts well in excess" of the full price. Instead, Alliance sought to have Bruno become financially liable for the amount. The judge also considered that Matthews and Kenneth had a preexisting relationship, where Kenneth owed Matthews hundreds of thousands of dollars with no clear means to repay the money. In our view,

the judge's findings were "supported by [a] reasonable view of the evidence, including all rational inferences of which it was susceptible" and there was no clear error (citation omitted). FOD, LLC v. White, 99 Mass. App. Ct. 407, 412 (2021).

We also do not accept Alliance's argument that the judge erred by including in the G. L. c. 93A damages award Bruno's attorney's fees for defending against the two liens on which Alliance ultimately recovered, instead of limiting the award to the fees related to two other liens that were dissolved near the outset of the case. The judge expressly rejected this theory, finding that Alliance's actions were unfair and deceptive with regard to all four liens, including the two that proved viable. As the judge found, "there was no clear authority making this unfair scheme unlawful under c. 254." However, Ivester continued to keep the equipment on the work site for long periods of time, taking "no steps to return the equipment to save rental charges." The judge further found that Alliance knew Ivester was doing this, and accumulating fees for Bruno, but "made no efforts to secure breturn of the equipment." This failure to act or at least notify Bruno was, at a minimum, immoral, unethical, oppressive, and unscrupulous and thus justified finding a c. 93A violation.

We recognize that, as a result of this appeal and the limitations of G. L. c. 254, Alliance's recovery under the liens

will include amounts that the trial judge concluded were "unreasonably, unfairly[,] and deceptively inflated." Consequently, we think it appropriate to give the judge an opportunity to consider whether Bruno may recover those amounts as additional damages on his G. L. c. 93A claim, and we remand for reconsideration of the c. 93A damages.  See, e.g., Nemirovsky v. Daikin N. Am., LLC, 488 Mass. 712, 729 (2021) ("On remand, the judge should . . . determine whether the G. L. c. 93A damages . . . should be enhanced"); Klairmont, 465 Mass. at 185-186 ("substantial reduction in the amount of damages the plaintiffs may recover on remand" may warrant reconsideration of attorney's fees awarded under c. 93A).

Conclusion.  We conclude that Alliance's liens were valid and that the judge erred by reducing the lien amount without authorization from G. L. c. 254, § 4, but that the amount of the liens should have been reduced by $111,924.06 in equipment repair costs.  Accordingly, that portion of the judgment related to Alliance's liens shall be amended to provide an award to Alliance in the amount of $585,505 (the total of the lien amount, $697,479.06, minus repair costs, $111,974.06).  With respect to the portion of the judgment related to Bruno's claim for violation of G. L. c. 93A, we affirm, but we remand the matter so the trial court can reconsider the appropriate amount

of c. 93A damages consistent with this opinion.  The judgment is otherwise affirmed.

Bruno is entitled to recover attorney's fees and expenses incurred in defending against Alliance's unsuccessful cross-appeal as to the G. L. c. 93A claims.  See Bonofiglio v. Commercial Union Ins. Co., 412 Mass. 612, 613 (1992).  See also Yorke Mgt. v. Castro, 406 Mass. 17, 19 (1989) (language in c. 93A making "provisions for a 'reasonable attorney's fee' would ring hollow if it did not necessarily include a fee for the appeal").[11]

So ordered.

---

[11] In accordance with the procedure specified in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), Bruno may, within fourteen days of the issuance of the rescript in this case, submit an application for attorney's fees with the appropriate supporting materials in defending the G. L. c. 93A claims.  Alliance shall have fourteen days thereafter to respond.  See Fariello v. Zhao, 101 Mass. App. Ct. 566, 573 n.5 (2022).